# WHEELING.

## TOWN OF RAVENSWOOD *v.* FLEMINGS.

Submitted June 22, 1882—Decided July 7, 1883.

(\*WOODS, JUDGE, Absent.)

1. The Ohio river is navigable and is a public highway in the highest and broadest intendment possible. (p. 56.)

2. Riparian owners of land on the Ohio river, as against the State of West Virginia, hold their titles only to ordinary high-water-mark. (p. 69.)

3. The bed, banks and shores of the Ohio river are held by the State in trust for the public. (p. 69.)

4. It is competent for the Legislature to confer on municipal corporations, in aid of the navigation of said river, the exclusive right to construct wharves within their corporate limits between ordinary-high-water-mark, and low-water-mark without compensation to the adjacent lot-owner for the land so taken for that purpose. (p. 69.)

5. The act of the Legislature denying the right of a riparian owner in an incorporated town or city without the consent of the council of said town or city to build a wharf, pier or bulk-head on the space adjacent to his lot between ordinary high-water-mark and low-water-mark is constitutional. (p. 70.)

6. Where a lot-owner under such circumstances does attempt to erect such wharf, &c., without the consent of the council of the city or town, the city or town may enjoin him from so doing. (p. 69.)

The facts of the case are stated in the opinion of the Court.

*Robert White* and *R. S. Brown* for appellant.

*N. Fitzhugh* for appellee.

JOHNSON, PRESIDENT :

The town of Ravenswood was chartered by the Legislature of the State of Virginia by an act passed, March 10, 1852. Said charter was amended by the Legislature of West Virginia by an act passed February 25, 1868. By both of said

---

\*Cause submitted before Judge W. took his seat on the bench.

acts, § 4 act of 1852, and § 22 act of 1868, authority was given to said town to construct landings, wharves and docks. Within the limits of the corporation, as defined by said charter, the defendants, F. F. and G. P. Fleming, commenced building a wharf and landing opposite to their lot within said corporation, claiming the right to do so as riparian owners, without the consent of the town-council of Ravenswood. The council of said town directed the said obstruction to be removed, and when the officers of the town attempted to execute said order they were resisted by the defendants, who also sued out a peace-warrant against the said officers, who were required by a justice to give bonds to keep the peace. Thereupon the town of Ravenswood on the 31st day of July, 1880, filed a bill before the judge of the fifth judicial circuit praying an injunction against the defendants, restraining and enjoining them from the construction of said wharf, &c., which was granted. The bill sets out the provisions of the act incorporating the plaintiff and the' amendment to said act, and states, that the defendants are commencing to construct the wharf, &c., within the boundary of said incorporated town, without the consent of its council; that said wharf, &c., is being constructed between high-water and low-water marks on the Ohio river, which is a navigable river; "that all of said river front between high-water-mark and low-water-mark, as well as the bed of said river, belonged to the commonwealth of Virginia, when said town was laid out; that the said Ohio river was and is a public, navigable river forming the boundary-line between Virginia and Ohio; and that the State of West Virginia on its formation succeeded to the public rights in the bed and the banks of the Ohio river formerly held by Virginia, including the sovereign right to hold, construct or grant to others the franchise of making public wharves and landings thereon; and that the said State of West Virginia did in due form, by act of its Legislature, grant such right and franchise to hold, build and keep such public wharves and landings to the plaintiff, within the corporate limits of said town," &c.

The defendants answered and claimed, that the patent under which they claim called for an object "on the Ohio river and to run with the meanders thereof;" that the

patentee by virtue of said grant became and was vested with the full ownership and fee simple of the said tract of land, and that the boundaries thereof extended to and ran along with the middle of the Ohio river, *ad medium filum aquæ*, and that no Legislature of the State of Virginia or of this State has ever lessened or destroyed the rights of the said patentee, and that any attempt by legislation or otherwise, if any were ever made, to take away, lessen or destroy the rights lawfully conferred by said patent would be unconstitutional, illegal and void;. that the rights of the original patentee have come down intact to this day, and now. belong to and are vested in the riparian owners, who hold under said patent. The defendants in their answer admit, that by the act of 1868 their land was taken into the corporate limits of the town, but insist that "the mere fact that they and their land were taken into the corporation did not strip them of their property and vest it in the town without condemnation and without compensation. This would have been to violate the Constitution, and to invade the most sacred rights of property. The town in its bill seems to rely greatly on the twenty second section of the act of 1868, as authorizing the conversion of private property to public uses without any compensation, but that section only authorizes the town to erect wharves on land, which does or shall belong to said town." Respondents insist, that they have the full and sole right to enjoy the said bank of the river *to low-water-mark*, subject only to the unobstructed navigation of the river; *that they have a right to make their own landing on their own land* at their own cost, provided that they do not obstruct navigation. They pray, that the injunction be dissolved and the bill dismissed.

The pleadings therefore show, that the plaintiff, the town of Ravenswood, was incorporated and entrusted with the power of building wharves, &c.; that within the limits of said town and without the consent of the town-council of said town, between high-water-mark and low-water-mark on the Ohio river, the defendants, who owned a lot on said river, commenced and claimed the right to complete the construction of a wharf and ice-harbor in front of this lot, claiming the right so to do as riparian owners. On the 11th day of September, 1880, the cause was heard by the circuit court

of Jackson county, and the injunction was dissolved. From, this decree the Town of Ravenswood appealed. The Town of Ravenswood here insists, that the injunction should have been perpetuated; and the defendants insist that the decree was proper and should be affirmed. The pleadings raised the question of the dedication to the town of the plat of ground on which the defendants were building their wharf, &c., but in the view which we take of the question involved that point is wholly immaterial. Elaborate briefs of learned counsel on both sides have been filed, which have greatly aided us in arriving at a conclusion.

It is insisted by counsel for the appellees, that the Ohio river is not a navigable river according to the common law definition of the term; that only arms of the sea and streams, where the 'tide ebbs and flows, are by the common law deemed navigable; and streams above the tide-water, though navigable in fact are not navigable in law. For this *Middleton* v. *Pritchard*, 3 Scam. 510, and *Morgan* v. *Reading*, 3 Smedes & M. 366 are cited. The decisions in these cases and in a number of others do so hold, but against the great weight of authority as well as against reason. It is true, that "the only waters recognized in England as navigable were the tide-waters, yet the reason of the rule would apply equally to waters in fact navigable above the flow of the tide, that reason being, that the public authorities ought to have entire control of the great passage-ways of commerce and navigation to be exercised for the public advantage and convenience. The confusion of navigable with tide-water streams found in the monuments of the common law long prevailed in this country, notwithstanding the broad differences existing between the extent and topography of the British island and that of the American continent. It had the effect for two generations of excluding the admiralty jurisdiction from our great rivers and inland seas; and under the like influence it laid the foundation in many States of doctrines with regard to the ownership of the soil in navigable waters above tide-water at variance with sound principles of public policy." *Barney* v. *Keokuk*, 94 U. S. 338.

In the *Genesee Chief* v. *Fitzhugh*, 12 How. 443, it was held, that the admiralty and maritime jurisdiction granted to the Fed-

eral government by the Constitution of the United States is not limited to tide-water, but extends to all public navigable lakes and rivers, which are used for commerce between different States or with foreign nations. In this case Chief Justice Taney, who delivered the opinion of the court said : "The courts of the United States naturally adopted the English mode of defining a public river, and consequently the boundary of admiralty jurisdiction. It measured it by tide-water, and that definition having found its way into our courts became after a time the familiar mode of describing a public river, and was repeated as cases occurred without particularly examining, whether it was as universally applicable in this country as it was in England. * * The description of a public navigable river was substituted in the place of the thing intended to be described, and under the natural influence of precedents and established forms, a definition originally correct was adhered to and acted on after it had ceased from a change in circumstances to be the true description of public waters. * * It is evident, that a definition which would at this day limit public rivers in this country to tide-water rivers is utterly inadmissible. We have thousands of miles of public navigable water, including lakes and rivers, in which there is no tide; and certainly there can be no reason for admiralty power over a public tide-water, which does not apply with equal force to any other public water used for commercial purposes and foreign trade." In this case the court did not change the common law definition of a navigable river, but adapted it to the condition of this country, to which it would have applied in England, if the same condition of things had existed there.

Is the Ohio river a navigable, public river ? That it is, the Court will take judicial notice. In *State of Pennsylvania* v. *Wheeling, &c., Bridge Co.*, 13 How. 561, Mr. Justice McLean speaking for the court said : "That the Ohio river is navigable is an historical fact, which all courts may recognize. For many years the commerce upon it has been regulated by Congress, under the commercial power, by establishing ports, requiring vessels which navigate it to take out licenses, and to observe certain rules for the safety of their passengers and cargoes. Appropriations by Congress have been frequently

made to remove obstructions to navigation from its channel."
As well as we know anything do we know the fact, that the
Ohio is a navigable river from Pittsburgh, where it is formed
by the junction of two rivers, to its mouth where it is lost
in the Mississippi; that it forms the boundary of six large
States, and bears upon its waters vessels, which transport
much of the produce of its fertile valley to market. The
whistles of the great steamers, which run from port to port
on the great river, sound daily in our ears. To say that it
is not navigable is to assert as a fact, that which no one could
for a moment believe.

It has been held in very many cases, that riparian owners
of land on rivers in fact navigable are governed by the com-
mon law as to the extent of their boundaries. The Ohio
river being navigable, do riparian owners of land on said
river hold, as against the State, to high-water or low-water
marks? It is not contended by any of the authorities, that if
the river is navigable at common law, riparian owners hold
to the middle of the stream. In *Martin* v. *Waddell*, 16 Pet.
367, it was held, that when the Revolution took place, the
people of each State became themselves sovereign, and in
that character held the absolute right to all their navigable
waters and the soil under them for their common use, sub-
ject only to the rights since surrendered by the Constitution
to the general government.

*Pollard's Lessee* v. *Hagan*, 3 How. 212, was a writ of error
to the supreme court of Alabama. The action was ejectment,
brought by the plaintiff in error in the circuit court of Ala-
bama, to recover a lot in the city of Mobile described as fol-
lows: "Bounded on the north by the south boundary of
what was originally designated as John Forbes & Co.'s canal;
on the west by a lot now or lately in the occupancy of, or
claimed by —— Ezel; on the east *by the channel of the river*,
and the south by Government street." The whole question
turned on the correctness of the charge to the jury, which
was as follows: "That if they believed, that the premises
sued for were *below usual high water mark* at the time the
State of Alabama was admitted into the Union, then the act
of Congress and the patent in pursuance thereof could give
the plaintiff no title, whether the waters had receded by the

aid of man only, or by alluvion." Under this instruction the jury found for the defendant, and the supreme court of Alabama affirmed the judgment.

Under the twenty-fifth section of the judiciary act, the judgment was reviewed by the Supreme Court of the United States and affirmed, Mr. Justice Catron dissenting. Mr. Justice McKinley, who delivered the opinion of the Court said page 228: "Alabama is therefore entitled to all the sovereignty and jurisdiction over all the territory within her limits, subject to the common law, to the same extent, that Georgia possessed it before she ceded it to the United States. To maintain any other doctrine is to deny, that Alabama has been admitted into the Union on an equal footing with the original States, the Constitution, laws and compact to the contrary notwithstanding. But her rights, sovereignty and jurisdiction are not governed by the common law of England, as it prevailed in the colonies before the Revolution, but as modified by our own institutions." He then quotes the language which I have already quoted from the opinion of the court in *Martin* v. *Waddell*, 16 Pet., and proceeds: "Then to Alabama belong the navigable rivers, and the soil under them in controversy in this case, subject to the rights surrendered by the Constitution to the United States; and no compact, that might be made between her and the United States, could diminish or enlarge these rights. The declaration therefore contained in the compact entered into between them, when Alabama was admitted into the Union, that all navigable waters within the said State shall forever remain public highways free to the citizens of said State and of the United States, without any tax, duty, impost or toll therefor imposed by the said State would be void, if inconsistent with the Constitution of the United States. But is this provision repugnant to the Constitution?" He comes to the conclusion that it is not and then says: "This supposed compact is therefore nothing more than a regulation of commerce to that extent among the several States, and can have no controlling influence in the decision of the case before us. This right of eminent domain over the shores and the soil under the navigable waters, for all municipal purposes, belongs exclusively to the States within their respective territorial jurisdictions, and they and they only

have the constitutional power to exercise it. To give to the United States the right to transfer to a citizen the title to the shores and soil under the navigable waters, would be placing in their hands a weapon, which might be wielded greatly to the injury of State sovereignty and would deprive the States of the power to exercise a numerous and important class of police powers. But in the hands of the States this power can never be used so as to affect the exercise of any national right of eminent domain or jurisdiction, with which the United States have been invested by the Constitution. For although the territorial limits of Alabama have extended all her sovereign power into the sea, it is there as on the shore but municipal power, subject to the Constitution of the United States, 'and the laws made in pursuance thereof.'" He arrives at these conclusions: "*First,* that the shores of navigable waters and the soil under them were not granted by the Constitution to the United States, but were reserved to the States respectively: *Second,* the new States have the same rights, sovereignty and jurisdiction over this subject as the original States: *Third,* the right of the United States to the public lands, and the power of Congress to make all needful rules and regulations for the sale and disposition thereof, conferred no power to grant to the plaintiffs the land in controversy in this case." This decision was re-examined and affirmed in *Goodtitle* v. *Kibbe,* 9 How. 471.

In *Pennsylvania R. R. Co.* v. *New York and Long Branch R. R. Co.,* 23 N. J. Eq. 159, the Chancellor said, "The facts of the case are clear and undisputed. The question is as to the rights of the parties upon these facts. It is settled by the decision of the court of errors and appeals in the case of *Stevens* v. *Patterson and Newark R. R. Co.,* 5 Vroom, that the lands under water, *including the shore,* on the tide-water of New Jersey belong absolutely to the State, which has the power to grant them to anyone, free from any right of the riparian owner in them." In that case it was granted for public use. I do not suppose the court wished to be understood as saying, that the State could grant such lands for mere private purposes.

*Gould* v. *Hudson River R. R. Co.,* 12 Barb. 616, was an action brought against the Railroad Company, which had

authority from the State to construct its road between high-water and low-water mark opposite the land of the plaintiff. In his declaration he described his premises and alleged, that said river, "is a navigable stream, in which the tide ebbs and flows from the mouth thereof, where the same enters into the sea, to a point about forty miles above the said farm of the plaintiff, and which river being a public highway the said plaintiff had a right to use with vessels, boats, floats and other craft to embark thereupon from his said farm, for the purpose of carrying away the produce thereof, and for the purpose of bringing manure and other materials to and upon the same; and for a long time previous, to the construction of the embankment and railroad track by the defendants * * * * had used said river for such and other lawful purposes." The complainant then sets out the incorporation of defendants and alleges, that claiming the right to do so under its charter, it had entered upon the said Hudson river in front of and adjacent to the said plaintiff's farm, and *below the ordinary high-water and above the ordinary low-water marks* of said river, had raised and constructed a line of solid embankment extending from a point in said river opposite the south line, to a point in said river opposite the north line of the plaintiff's farm, &c. He alleges, that said embankment was raised in front of his farm about five feet above the ordinary high water mark of said river, and that it forms a complete barrier to the passage of vessels, boats, floats and other river craft through the same; that this was done without his consent, and without compensating or offering to compensate him for the damages and injuries done him. He laid his damages at five hundred dollars. A demurrer to the declaration was sustained, and the plaintiff appealed. In 6 N. Y. 522 the judgment was affirmed. The court held, that the owner of the lands adjoining a navigable river, in which the tide ebbs and flows, has no private right or property in the waters of the river or in the shore between high water and low water mark, and is therefore not entitled to compensation from a railroad company, which constructs in pursuance of a grant from the Legislature a railroad along the shore between high-water and low water-mark, so as to cut off all

communication between such land and the river, otherwise than across such road. Whatever rights the owner of the land in such case has in the river or in its shore below high-water-mark are public rights, which are under the control of the legislative power, and any loss sustained through the act of the Legislature affecting them is *damnum absque injuria.*"

In *The People* v. *Tibbetts*, 19 N. Y. 523, it was held, that the State has the title to all the navigable waters within its borders, subject only to the jurisdiction delegated by it to Congress in the Constitution of the United States for the regulation of commerce; that although the proprietors of lands on the banks of navigable waters have rights to the use of such waters, which cannot be impaired by individuals, yet such rights are subordinate to those of the State, and cannot in any manner interfere with the exercise of such public rights. To the same effect is *The People* v. *The Canal Appraisers*, 33 N. Y. 461.

In *Comm.* v. *Tewksbury*, 11 Met. 55, it was held, that a Massachusetts statute, which imposed a penalty on "any person, who shall take, carry away or remove any stones, gravel or sand from any of the beaches in the town of Chelsea" was passed for the purpose of protecting the harbor of Boston and extends as well to the owner of the soil as to strangers. In *La Plaisance Bay Harbor Co.* v. *City of Monroe*, 1 Walk. Ch. (Mich.) 168, the Chancellor said: "The complainants do not own either the bed or the banks of the river below the point of obstruction; the bed of the stream is public property, and belongs to the State. This is the case with all meandering streams, no part of them being included in the original survey; and the common law doctrine of *usque ad medium filum aquœ* is not applicable to them. The public owns the bed of this class of rivers, and is not limited in its right to an easement or right of way only. So with regard to our large lakes or such parts of them as lie within the limits of the State. The proprietor of the adjacent shore has no property whatever in the land covered by the water of the lake."

In *The Mayor, &c., of Mobile* v. *Eslava*, 9 Porter 578, the court held, that the navigable waters within the State, have been dedicated to the use of the citizens of the United States,

that it is not competent for Congress to grant a right of property in the same; that the navigable waters extend not only to low-water, but embrace all the soil that is within the limits of high-water-mark.

The most elaborate opinion on the subject to be found in the books is that of Judge Woodward, in *McManus* v. *Carmichael*, 3 Ia. 1. McManus owned land on the Mississippi river; in front of his land at low water was a sand-bar and from this bar between high-water and low-water marks Carmichael took two boat loads of sand, for which McManus sued him in an action of trespass. The lower court found judgment for the plaintiff, and the defendant appealed. Learned counsel filed able and exhaustive briefs, and upon a thorough review of the authorities the court held that "although the ebb and flow of the tide was at common law the most usual test of navigability, it was not necessarily the only one. But however this may be, the test is not applicable to the Mississippi river. The common law consequences of navigability attach to the legal navigability of the Mississippi. The term *navigable* embraces within itself not merely the idea, that the waters could be navigated, but also the idea of publicity, so that saying waters are public is equivalent in legal sense to saying, that they are navigable. Yet the navigability in fact is the leading idea, and is the ground of their publicity. The ebb and flow of the tide does not in reality make the waters navigable, nor has it in the essence of the thing anything to do with it. It is navigability *in fact*, which forms the foundation for navigability *in law*, and from the *fact* follows the appropriation to public use and hence its publicity and legal navigability. The real test of navigability in this country is ascertained by use or by public act or declaration. The acts and declarations of the United States declare and constitute the Mississippi river a public highway in the highest and broadest intendment possible. The common law knows but two lines, the *medium filum aquæ* and high water. If the stream be navigable the boundary of the adjoining land is the one; if not navigable, the other. By the common law the riparian proprietor on navigable waters owns to high water mark only, and this rule applies to the Mississippi river." The court reversed the judgment.

The same principle is announced by the supreme court of
Iowa in *Haight* v. *Keokuk*, 4 Ia. 199. In *Barney* v. *Keokuk*,
94 U. S. 324, it is held, that "in order that the passage-ways
of commerce and navigation might be subject to public au-
thority and control, the title to the land under water and
to the same below ordinary high-water-mark, in navigable
rivers and arms of the sea, was by common law vested in the
sovereign for the public use and benefit. In England tide-
waters only were navigable, hence the rule as to property
was often expressed as applicable to them only, although the
reason of it would make it apply to all navigable waters.    *
*    *    The form instead of the substance of the rule has been
adopted in many of the States of this country, and in them
the public title to the beds and shores of navigable streams
is confined to tide-water. From the same cause, the admiralty
jurisdiction of the United States was for a long period re-
stricted to tide-water. Since the decision of this Court in *The
Genessee Chief* in 1851, 12 How. 443, declaring all the great
lakes and rivers of the country navigable, that are really
such, there is no longer any reason for thus restricting the
title of the *State*, except as a change in that respect might
interfere with vested rights and established rules of property.
In Iowa the true rule has been adopted; and it is held,
that the bed of the Mississippi river and its banks to high-
water-mark belong to the State, and that the title of the
riparian owner extends only to that line."

Mr. Justice Bradley in delivering the opinion of the court
said of the case of *McManus* v. *Carmichael*, 3 Ia. 1, "the ex-
haustive examination of this question by the supreme court
of Iowa    *    *    really leaves nothing to be said. The pre-
cise point was directly before the court, namely : Whether
the title of the riparian proprietor extends below high-water-
mark in the Mississippi river; and it was decided that it does
not." He also says on page 338 : "The cases in which this
court has seemed to hold a contrary view depended, as most
cases must depend, on the local laws of the States, in which
the lands are situated. In Iowa, as before stated, the more
correct rule seems to have been adopted, after a most elabo-
rate investigation of the subject." The cases evidently
referred to by Mr. Justice Bradley in the above cited opin-

ion are *Dutton* v. *Strong*, 1 Black 25, *The Railroad Co.* v. *Schurmier*, 7 Wall. 272 and *Yates* v. *Milwaukee*, 10 Wall. 497. This last case is cited and relied on by the appellee's counsel in his brief, but it can have no effect here, unless the statutes and decisions of Virginia and of this State make it applicable, and are of such a character as to require us to decide in accordance therewith.

What is the position of Virginia, and of our own State on this question? In *Home* v. *Richards*, 4 Call 441, it was held, that the bed of a *navigable* river in this commonwealth cannot be granted. In a river *not* navigable the owner of the soil on either side is proprietor of the bed to the middle of the stream. In *Hayes's ex'or* v. *Bowman*, 1 Rand. 417, it was held, that when land is conveyed, which is bounded by a water-course *not navigable*, such conveyance carries with it the title to a moiety of the bed of the water-course. In *Norfolk City* v. *Cooke*, 27 Gratt. 430, it was held, that a patent for land constituting a part of the bed of a *navigable river* conveys no title to it.

In the ordinance passed by the Confederate Congress July 13, 1787, entitled, "An ordinance for the government of the territory of the United States northwest of the Ohio river," section 4, last clause, it is provided as follows: "The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same shall be common highways, and forever free, as well to the inhabitants of the said territory as to the citizens of the United States, and to those of any other States, that may be admitted into the Confederacy, without any tax, impost or duty therefor." This was approved by Virginia, and in the same generous spirit on the 15th day of January, 1802, the Legislature passed the following act, with reference to the navigable rivers west of the mountains in that State: "Whereas it hath been represented to this present General Assembly, that many persons have located and lay claims in consequence of such location to the *banks*, *shores* and *beds* of the rivers and creeks in the *western* parts of this commonwealth, which were intended and ought to remain as a common to all the people thereof, be it therefore enacted, that no grant issued by the register of the land office for the same, either in consequence of any

survey already made or which may hereafter be made shall be valid or effected in law to pass any interest therein."

An examination of all the statutes of Virginia will show, that the State has always asserted the right in its exercise of sovereignty to control the bed, shores and banks of all the navigable waters within the commonwealth. 10 Hen. St., ch. 2 p. 226; 1 Rev. Code, ch. 86 p. 323; Code of 1849, ch. 62 p. 326; Code of 1860, ch. 62 p. 366. In the first Constitution of West Virginia, art. 1, sec. 1, is this provision: "The State of West Virginia shall also include so much of the bed, banks and shores of the Ohio river as was heretofore apportioned to the State of Virginia; and the territorial rights and property in and the jurisdiction of whatever nature over the said beds, banks and shores heretofore reserved by or vested in the State of Virginia shall vest in and be hereafter exercised by the State of West Virginia." The Constitution of 1872 contains in substance the same language, but includes the Big Sandy river, and adds: "And such parts of the said beds, banks and shores as lie opposite to and adjoining the several counties of this State shall form parts of said several counties respectively." The provisions referred to in the Code of Virginia were inserted in the Code of West Virginia.

In the Acts of the Virginia Legislature of 1839-40, chap. 71, page 58, is found the following provision: "Any person owning land upon a water-course may erect a wharf on the same, or a pier or bulkhead in such water-course opposite his land, so that the navigation be not obstructed thereby, and so that such wharf, pier or bulkhead shall not otherwise injure the private rights of any person. But the court of the county, in which such wharf, pier or bulkhead shall be after causing ten days' notice to be given to the owner thereof of its intention to consider the subject, if it be satisfied that such wharf, pier or bulkhead obstructs the navigation of the water-course or so encroaches on any public landings as to prevent the free use thereof may abate the same. Any person desiring the privilege of erecting a wharf at or on any county-landing may after giving notice of his intention by advertising such notice at some public place near the landing, and also at the front door of the court-house of such county on the first day of the term of the court of said

county, present to the court at its next term a petition for such privilege, and the court shall order all the acting justices of the county to be summoned to attend at the following term to consider the same; when, if two thirds of the justices present concur, the court may grant such privilege, and fix such rates and charges upon such conditions as it may see fit. But the court at any subsequet term, after causing all the acting justices of the county to be summoned and ten days' notice to be given to the owner, may if two thirds of the justices present concur, revoke such privilege or alter such conditions and limitations as regulate the rates and charges. This section shall not be construed to authorize a county court to grant the privilege of erecting a wharf within a town which has a corporation court."

These provisions were inserted in the Code of 1849, ch. 52, §§ 46, 47, and are to be found in the Code of 1860, ch. 53, §§ 47, 48. These provisions are substantially contained in the Code of West Virginia, ch. 43, §§ 40, 41, with this important modification, see section 42: "Nothing contained in either of the last two sections shall be construed to authorize the erection of any wharf, pier or bulkhead within the limits of an incorporated town, village or city, without the consent of the council thereof."

The same provisions, substantially, are in the Acts of 1872–3 ch. 194, §§ 46, 47, 48, with this additional section, 49: "Nothing contained in this act shall be construed to take from the jurisdiction, charge or control of the council, trustees or other authority of any town, village or city so much of any road, bridge, landing or wharf, as by the laws now in force, is under such jurisdiction, charge or control exclusively."

What do these statutes mean? They clearly indicate, that Virginia always assumed to exercise control over the beds of her navigable streams. The *beds* of course include the shores and the whole space through which the stream flows. The latter acts of West Virginia show, that the Legislature did not intend to allow any one, without the consent of the council thereof, to build a wharf, pier or bulkhead within the limits of an incorporated town, village or city. Both States have clearly shown, that they have claimed to own

and control for the public good the beds, shores and banks of all navigable rivers.

In *French* v. *Bankhead*, 11 Gratt. 136, which involved the construction of a grant of a tract of land to the United States, whether the grant did or did not convey to low-water-mark. Judge Allen, president, speaking for the whole court, pp. 159–60, said: "If it were a mere grant of property, the jurisdiction remaining in the State, the right of the grantee would extend to ordinary low water mark, under the express provisions of the act of the Assembly, 1 Rev. Code of 1819, ch. 87 p. 341, which declares, that hereafter the limits or bounds of the several tracts of land lying on the Atlantic ocean, the Chesapeake bay and the rivers and creeks thereof within this commonwealth shall extend to ordinary low-water-mark; and the owners of said land shall have, possess and enjoy exclusive rights and privileges to and along the shores thereof down to ordinary low-water-mark. By the common law the title of the proprietor extends to the ordinary high-water-mark. The shore or that space alternately covered and left dry by the rise and fall of the tide, being the space between high and low-water mark, was in the king for the use of the public. The law of Virginia so far at least as it relates to the soil has been altered; and the limits or boundaries of the land extend over and include the shore by operation of law. This was the law in force, when the cession of the land at Old Point Comfort was made, and the law being general, and speaking at every instant of time, it operated upon the grant to the United States, and extended the bounds down to ordinary low-water-mark, thereby annexing the right to the soil between ordinary high-water and low-water marks as incident or appurtenant to the adjacent land." The statute referred to only applied to "the Atlantic ocean, the Chesapeake bay, and the rivers and creeks thereof." It had and was intended to have no application whatever to the Ohio river.

We have seen that the Ohio river is a great public highway, and according to the overwhelming weight of authority, according to the statutes and decisions of the State of Virginia, the riparian owners of land on its banks have no title as against the State, beyond ordinary high-water-mark, and

that the title to the bed, the shores and banks to ordinary high-water-mark is now in the State of West Virginia for the use of the public.   This conclusion is absolutely necessary to properly preserve for the people the free navigation of that great highway.   If each riparian owner had the right to build a wharf of his own, and to deny the right of any one to land there without paying tribute to him, or to deny him the right to land at all on land adjacent to his farm or lot, the navigation of the river could not in any sense be free.   It is the exercise of one of the highest prerogatives of sovereignty for the State to preserve to all the people of this great country the right to navigate the river; and the free navigation of the same carries with it the right to do all that is necessary for the proper and profitable navigation thereof; that is to land where the navigator pleases to land, to put off his produce or goods on any convenient ground anywhere below ordinary high-water.mark, without hinderance from any person, whether a riparian owner or any one else. The riparian owner of the farm or lot opposite where he lands has no more right to molest him than a stranger. He has no rights over that space, between ordinary high-water-mark and low-water-mark, as against the State or its agents, or as against any one, who is enjoying the protection of the State in navigating the river.   The great Ohio is composed of its bed, shores and banks, and the water that flows over the bed and shores between the banks, and they are all alike dedicated to public use.   It is the heritage of our fathers, carefully guarded, to be used in entire freedom for the purposes of travel, trade and traffic, and whenever we are within these limits we feel, that we are at home, and cannot be trespassers.

In aid of the free navigation of the river, the Legislature delegates to those cities and towns, which it incorporates, the exclusive right to construct wharves.   This it certainly has the right to do.   It is necessary that such municipal corporation should have the exclusive right to regulate their own wharves; if they had not it would be difficult if not impossible to discharge the public trust reposed in them.   They are held to the strictest accountability by those, who navigate the river, for any injury which they may suffer in their per-

sons or property by reason of the wharves not being in good repair. _Pittsburgh_ v. _Grier_, 22 Penn. St. 54; _City of Petersburg_ v. _Applegarth_, 28 Gratt. 321.

If any riparian owner of a lot in an incorporated town could have the privilege of making a wharf opposite his lot, it would of course be impossible for the Legislature through the municipal corporation to regulate it. It was held in _Barney_ v. _Keokuk_, 94 U. S. 324, that "The public authorities have the right in Iowa to build wharves and levees on the bank of the Mississippi below high-water-mark, and to make improvements thereon necessary to navigation or public passage by railways or otherwise, without the consent of the adjacent proprietor, and without making him compensation." As we have seen, the same rule applies here to the Ohio river, as was applied in that case to the Mississippi.

The principles evolved from the great weight of authorities, to which we have referred, are that the Ohio river is navigable and a public highway in the highest and broadest intendment possible; that riparian owners of lands thereon, as against the State of West Virginia, hold to ordinary high-water-mark only; that the beds, banks and shores of the Ohio river are by the State held in trust for the public; that it is competent for the Legislature to confer on municipal corporations the exclusive right to build wharves within their corporate limits, between ordinary high-water-mark and low-water-mark on said river, without compensation to the adjacent lot-owner for the land so taken for that purpose.

It is insisted in the brief for appellee, that an injunction would not lie in this case. It is the only remedy which will give full and adequate relief, and has often been resorted to in such cases. _Railroad Co._ v. _Schurmier_, 7 Wall. 272; _Yates_ v. _Milwaukee_, 10 Wall. 497; _Trustees of Watertown_ v. _Cowen_, 4 Paige Ch. 510.

The question is not here involved as to what rights riparian owners of lands on navigable rivers between high and low water-marks have as against strangers. We here hold, that as against the State they have none. In my opinion they have an undoubted right to the exclusive use of the banks and shores of the navigable rivers adjacent to their farms as

against every stranger, who is not navigating the river or exercising some public privilege, that pertains to every one in the use of a navagable stream, and that they could maintain trespass against any one, who should cut trees there, or who should take drift-wood therefrom or sand, gravel or earth, or who should take therefrom coal or other valuable things that might lodge thereon. The act of 1872, which denies the right to *any person* to erect a wharf, pier or bulkhead within the limits of an incorporated town or city without the consent of the council, clearly refers to any wharf, pier or bulkhead whether public or private, and, as we have already said, for the reasons aforesaid is clearly constitutional.

The decree of the circuit court of Jackson county dissolving the said injunction is reversed with costs to the appellant; and this Court proceeding to render such decree as the circuit court should have rendered, the injunction granted by the judge of the circuit court is made perpetual, with costs to the plaintiff in the court below.

JUDGES GREEN AND SNYDER CONCURRED.

DECREE REVERSED.