# CHARLESTON.

UNION SAND & GRAVEL COMPANY *v.* MAMIE NORTHCOTT *et al.*

(No. 5743)

Submitted October 12, 1926.   Decided November 9, 1926.

1. NAVIGABLE WATERS—*Owner of Land Bounded by Ohio River,
   Not Otherwise Limited by Deed, Has Rights and Title of
   Riparian Owner to Low Water Mark (Const. Art. 2, § 1).*

   The owner of land bounded by the Ohio River, not other-
   wise limited by the terms of his deed, has all the rights and
   title of a riparian owner down to and including low water
   mark.   (p. 520.)

2. SAME—*Holder of Tax Deed to Island in Ohio River Held to
   Have, as Against Stranger or Trespasser, All Rights of
   Riparian Owner of Land on Mainland (Const. Art. 2, § 1;
   Acts 1872-73, c. 134, §§ 1, 3; 2 Vt. St. at Large, p. 317).*

   One who holds a tax deed to an island in the Ohio River
   in this state, originating in a proceeding begun in 1878, has,
   as against a stranger or trespasser, all the rights of a ri-

parian owner of land on the mainland bordering on said river. (p. 527.)

3.  SAME—*Riparian Owner of Island May Maintain Trespass Against Person Entering Between High and Low Water Mark and Removing Sand and Gravel.*

    And such a riparian owner of an island may maintain trespass against one who without his permission enters upon such island between high and low water mark and removes sand and gravel therefrom, for the value of such material. (p. 529.)

4.  SAME—*Trespasser, Entering in Good Faith, Believing He Had Right to Take Gravel Between High and Low Water Mark, is Liable for Actual Value Thereof.*

    But if the defendant enters with permission of the federal government, and in good faith, believing he has the right to take such material at the place or places of entry, he will be liable to the owner only for the actual value thereof at the place from which it was removed. (p. 529.)

5.  SAME—*"Low-Water Mark" of Ohio River is Point to Which Water Recedes at Lowest Stage.*

    Low water mark within the intendment of our law, as related to the Ohio River, is the point to which the water recedes at its lowest stage. (p. 528.)

6.  SAME—*Low Water Mark of Ohio River is Not in Legal Contemplation Changed by Locks and Dams Built to Improve Navigation.*

    And such low water mark will not in contemplation of law be changed by locks and dams built by the state or federal government in the improvement of navigation or in aid of commerce upon said river. (p. 529.)

LITZ, PRESIDENT, WOODS, JUDGE, Dissenting.

Appeal from Circuit Court, Cabell County.

Suit by the Union Sand & Gravel Company against Mamie Northcott and others, partners, etc., for an injunction and for damages. From a decree for plaintiff, defendants appeal.

*Affirmed.*

*Northcott & Yost* and *Livezey & McNeer,* for appellants.

*George S. Wallace* and *L. L. McClure,* for appellee.

MILLER, JUDGE:

Complainant, claiming right and title to Racoon Island, situate in the Ohio River about six miles below the City of

Gallipolis, in the State of Ohio, upon a bill filed in the Circuit Court of Cabell County, obtained an injunction perpetually restraining and inhibiting defendants,. and each of them, their officers, agents and employees, from trespassing upon or removing any sand and gravel from said island above the low water elevation, as shown on Government Chart No. 76, filed as Exhibit No. 3 with plaintiff's amended bill, and above the exterior line in red as shown on Merrick's Exhibit No. 2; also a decree against the defendants for the sum of $288.00, the value at three cents per cubic yard, for 9600 cubic yards of gravel actually removed therefrom. It was from this decree that the final appeal was taken by defendants, and now before us for review.

It is a concessum, that aside from the incidental questions, the issues presented by the pleadings, and the determination of the plaintiff's right to the relief prayed for, and granted, are:

> "1.   Has the plaintiff by reason of its ownership of Racoon Island any title to the sand and gravel bar surrounding the same, between high and low water marks?
> "2.   If the first question be answered in the affirmative, where, under the existing conditions, in said river, is low water mark located, and was it properly located by the final decree with reference to Government Chart No. 76?"

In deraignment of its title to Racoon Island plaintiff alleged in its original bill that its immediate source of title was a deed dated September 16, 1924, from Moses T. Epling, recorded in Mason County, West Virginia, December 17, 1924; that title reverted back for its remote and ultimate source of title, to a decree and deed originating in a suit instituted in 1878 by one F. A. Guthrie, Commissioner of School lands of Mason County, to sell said Racoon Island as waste and unappropriated land of the State. The bill does not allege the name of the purchaser, nor the date of the deed, but there was introduced in evidence a part of the record in the suit of Guthrie, School Commissioner, including an order therein, of April 21, 1879, showing that the purchaser was one Lewis

J. Cook, his compliance with the terms of sale, confirmation thereof, and directing the commissioner, upon payment of the residue of the purchase money, to execute and deliver to him a proper deed, conveying to him all the right, title and interest of the State, in and to said lands. There was also introduced in evidence a decree, purporting to have been made in another chancery suit, brought by E. L. Meade, against L. J. Cook, to subject said Racoon Island as Cook's property to the payment of a judgment of plaintiff against him, and in which it was found that Cook was entitled to a deed for said island, and appointing one Gibbons special commissioner to execute and deliver to him a deed therefor, and decreeing the same to be sold by one Gunn, special commissioner, to satisfy said judgment. Another order entered in said cause, on May 7, 1889, introduced in evidence, shows payment and satisfaction of said judgment and a direction that the cause be retired from the docket.

Another fact respecting the title, not covered by any pleading, but appearing in the record as evidence, is that this island tract was delinquent for taxes in 1916, purchased by the State, and was again proceeded against, and sold by B. H. Blagg, Commissioner of School Lands, in 1924, in which proceeding, Epling and Sheppard, in whose name the delinquency occurred, disclaiming in favor of plaintiff in this suit, appeared and filed their answer; and plaintiff appeared also, and by answer or petition claiming the right of redemption, was on its motion permitted to redeem the property from said forfeiture. A certificate of the clerk of the county court, also filed in the cause, shows that the property was regularly taxed from 1890 to and including 1924, and that there was no intervening delinquency or sale of the property except for the year 1916, already alluded to.

While these facts respecting the title to Racoon Island thus appear in the record, no real objection to plaintiff's right thereto is interposed, except the broad proposition contended for, that the commissioner of school lands had no jurisdiction or authority to proceed against said tract, in so far at least as the said title related to any part of the island below high water

mark, and included between that level and low water mark delineated on the Government Chart No. 76, referred to in the decree; defendants' major proposition being that at the time said school commissioner's proceedings were begun and continued, all the sand and gravel beds lying between such high water mark and low water mark constituted but a part of the bed and banks of the Ohio River, which were not subject to entry, or sale or disposition thereof for the benefit of the school fund, and that the proceedings of the school commissioners were absolutely void, in so far at least as they involved the right and title to the gravel and sand bars below high water mark; wherefore plaintiff had acquired no title thereto as against defendants or anyone else, with license or permit to take gravel or sand therefrom.

When so proceeded against in 1878, the land was described as a tract of "about 2 acres of land and sand and gravel bar surrounding same"; and in the commissioner's report to the court, it was represented that the same was subject to sale under section 1, chapter 134 Acts of the Legislature of 1872-3, as waste and unappropriated lands. Said act, in so far as it is applicable here, is as follows: "1. All waste and unappropriated lands within this state, and all lands in this state heretofore vested in the State of Virginia by forfeiture or purchase at the sheriff's or collector's sale for delinquent taxes and not released and exonerated or redeemed within one year, according to law; all lands heretofore or hereafter purchased for this state, at a sale thereof for taxes, and not redeemed within one year, according to law; and all lands forfeited to this state for the failure to have the same entered upon the books of the assessor and charged with the taxes thereon, as provided for by law, shall, as far as the title thereof shall not be vested in junior grantees or claimants under the provisions of the constitution and laws, be sold for the benefit of the school fund, in the manner hereinafter prescribed." By section 3 of the same act, however, it is provided that: "It shall be the duty of the surveyor of each county in this state, as soon as the same shall come to his knowledge, to report to the commissioner all waste and unappropriated lands in his

county, *except the lands under the bed of the Ohio River,* subject to sale under the provisions of this chapter.''

And in connection with this statute our attention is directed to the provisions of Section 1, Article II, of the Constitution, descriptive of the territory of the State, as including ''the bed, bank and shores of the Ohio River, and so much of the Big Sandy River as was formerly included in the Commonwealth of Virginia; and all territorial rights and property in; and jurisdiction over, the same, heretofore reserved by, and vested in, the Commonwealth of Virginia, are vested in and shall hereafter be exercised by, the State of West Virginia. And such parts of the said *beds, banks and shores* as lie opposite, and adjoining the several counties of this State, shall form parts of said several counties respectively.''

The only other statute having special application to the question in hand, and one much relied on by defendants, is an act of the General Assembly of Virginia, of January 15, 1802, 2 Va. Statutes at Large, p. 317, quoted by Judge SNYDER in full in *Barre* v. *Fleming,* 29 W. Va. 314, 317, providing, after the preamble, ''That no grant issued by the register of the land office for the same, either in consequence of any survey already made, or which may hereafter be made, shall be valid or effectual in law to pass any estate or interest therein.'' And in his opinion Judge SNYDER goes into the history of the common law, and of the various statutes and judicial decisions, state and federal, affecting the rights of the public and of riparian owners of land bordering upon the Ohio River and other waters of this State and of the United States, which need not be repeated here.   The grant involved in that case was one to General Washington, antedating said act of 1802, and was held not to be affected by the statute.   But in the same connection Judge SNYDER expresses doubt as to whether the statute was intended, or should be construed as denying the right to grant the banks and shores along any part of the Ohio River; the doubt, however, is to be interpreted with reference to the kind of a case he then had under consideration. That case involved the question whether the defendants, the Flemings, were entitled to an abatement of the purchase

money on a lot in Ravenswood purchased from plaintiff, because in *Town of Ravenswood* v. *Flemings,* 22 W. Va. 52, they had been perpetually enjoined from erecting a wharf thereon for their private business without the consent or permission of the municipal authorities, their deed purporting to convey the lot bounding the same on the river to low water mark. The effect of the decision was that the covenant in the deed was not broken because the defendants had not been allowed to erect such a wharf, inasmuch as the grantees took title to the lot thus bordering on the Ohio River subject to the public easement over the same and the public statutes relating thereto, wherefore the covenant of warranty was not broken, entitling the purchasers to such abatement of purchase money.

The preamble to the act of 1802 will show that it was intended to defeat the efforts of "many persons who had located and laid claim to banks, shores and beds of the rivers and creeks in the western part of the Commonwealth, which ought to remain as common to all the good people thereof." Plainly it was not intended to prevent the register of the land office, nor the commissioners of school lands, from proceeding to perfect title to lands sold or lands delinquent for the non-payment of taxes bordering on the Ohio River and held by riparian owners to low water mark theretofore when not otherwise restrained from doing so. The sole purpose was to prevent the acquisition of title to the banks, shores and beds of rivers, to the exclusion of the public or the rights of all the people for carrying on commerce thereon. We observe that while the act of 1802 describes the lands excepted as banks, shores and beds of the rivers, the acts of 1872-3, 1882, 1891 and 1893 limited such grants to the beds of such rivers. It is argued here that the bed of a river included beds, banks and shores. If so, unless we have misinterpreted our decisions cited, the rights of riparian owners are only limited to the rights of the public for the purpose of commerce, and not in title to low water mark. As was said by Judge GREEN in *Ravenswood* v. *Flemings, supra,* and noted by Judge SNYDER in *Barre* v. *Fleming,* riparian owners "have an undoubted

right to the exclusive use of the banks and shores of the navigable rivers adjacent to their farms as against every stranger, who is not navigating the river or exercising some public privilege, that pertains to everyone in the use of a navigable stream, and that they could maintain trespass against anyone, who should cut trees there, or who should take drift-wood therefrom, or sand, gravel or earth, or who should take therefrom coal or other valuable thing that might lodge thereon.'' So that we reach the same conclusion reached by Judge SNYDER in *Barre* v. *Fleming,* following his very learned discussion of the law, common and statute, prevailing here, that the title of a riparian owner of land bounded by the Ohio River extends at least to low water mark, subject to the easement of navigation and the right of the State to control its use for the promotion of commerce. This we think is the law of this state. The rule may be different in some of the states, as in Iowa, where title depends upon governmental grants of public lands on navigable waters, and which is limited, as the title of the government is, to the banks of such rivers. *Barney* v. *Keokuk,* 94 U. S. 324; but our local laws must determine the rights of riparian owners in this state. *Shively* v. *Bowlby,* 152 U. S. 1; *Gaston* v. *Mace,* 33 W. Va. 14; *Genesee Chief* v. *Fitzhugh,* 12 How. 443. The common law of England was and is that the title to land below high water mark on the ocean, and the beds, banks and shores of all rivers as far as the tide extended was in the crown; but that rule being inapplicable to conditions existing in this country, was compelled to give way to an American common law, now our law, except as modified, and as declared in *Genesee Chief* v. *Fitzhugh, supra.* In support of their position that the bed of the river includes its banks and shores, not subject to grant since the act of 1802, and the subsequent acts referred to, defendants' counsel cite us to *Ravenswood* v. *Flemings, supra; Brown Lumber Co.* v. *U. S.,* 55 Fed. 854; *State* v. *Gerbing,* 56 Fla. 603; and *Sun Dial Ranch* v. *May Land Co.,* 61 Ore. 205. We have already referred to Judge SNYDER's interpretation of *Ravenswood* v. *Flemings;* and an examination of the other cases will disclose the fact that they involved grants or licenses by the United States, of property or property rights

title to which at the time of the purchase or acquisition of the
territory covered, either was not conveyed or remained vested
in the state or the people, and not subject to the jurisdiction
of the United States, except in so far as its jurisdiction ex-
tended over the same for the purpose of interstate commerce.
*Pollard* v. *Hagen,* 3 How. 212.  Our decisions say, if they hold
anything, that while riparian owners may not acquire title to
the bed, banks and shores of the Ohio River to the exclusion
of the public for the purpose of commerce and navigation,
nevertheless the grant of land bordering on the river confers
title upon the grantee, subject to the public easement, to low
water mark, so that trespass may be maintained against the
wrongdoer for entering and taking driftwood or sand or
gravel.  This doctrine is based on the old common-law rule
that grants of land bordering on non-navigable waters ex-
tended title to the middle of the stream, and in case of navi-
gable waters to low water mark.  This is local law which has
not been abrogated or defeated by local legislation prior to or
since the act of 1802.  This is clearly the result of the authori-
ties cited and the reasoning of Judges SNYDER and GREEN in
the cases referred to.  We agree with Judge SNYDER in his sug-
gestion that the act of 1802 was not intended, and should not
be interpreted, as doing away with a rule so essential to give
a riparian owner all rights and rights of property so long
recognized in our law.  The rights of a riparian owner, as de-
fined by a high authority, are: *"First.* The right to be and
remain a riparian proprietor and to enjoy the natural ad-
vantages thereby conferred upon the land by its adjacency
to the water.  *Second.* The right of access to the water, in-
cluding a right of way to and from the navigable part.  *Third.*
The right to build a pier or wharf out to navigable water, sub-
ject to any regulations of the State.  *Fourth.* The right to
accretions or alluvium.  *Fifth.* The right to make a reason-
able use of the water as it flows past or laves the land."  1
Lewis on Eminent Domain (Second Edition), section 100, and
authorities cited.  *Weber* v. *Harbor Commissioners,* 18
Wall. 57.

The property here involved happens to be an island located
in the Ohio River; but it seems to be settled law that the

rights of a riparian owner to the mainland appertains to the owner of an island so situated. *The Bedford-Nugent Company* v. *Herndon,* 196 Ky. 477; *Wilson* v. *Watson,* 144 Ky. 352; *Ware* v. *Hager,* 126 Ky. 324.

The rights of plaintiff as a riparian owner and against defendants, take it to low water mark, or ordinary low water mark, whichever of these terms be properly descriptive of plaintiff's rights. The court in *Wood* v. *Appal,* 63 Pa. St. 210, cited by Judge SNYDER in *Barre* v. *Fleming, supra,* seems to use these terms interchangeably as meaning the same thing, though in the syllabus the words "ordinary low water mark" are used as descriptive of the boundary of a grant called for on navigable streams. But according to Gould on Waters (Third Edition), § 27, p. 63, these terms, according to Judge Wayne, in *Howard* v. *Ingersoll,* 13 How. 381, 417, have application properly only to those parts of rivers which are within the ebb and flow of the tide, to distinguish the water level at spring and neap tides, and where the difference is uniform twice within every month of the year, wherefore it is termed ordinary. As to that part of the river in which there is no ebb and flow, says the same authority: "The changes in the current are irregular and occasional, without fixed quantity or time of recurrence, except as they are periodical with the wet and dry seasons of the year. And low water is the furthest receding point of ebb tide." And in section 46 of the same work the author, again referring to *Howard* v. *Ingersoll, supra,* says: "The low-water mark is the point to which the river recedes at its lowest stage. The high-water mark is the line which the river impresses upon the soil by covering it for sufficient periods to deprive it of vegetation and to destroy its value for agriculture." Counsel for defendants cite us to *Scott* v. *Doughty,* 124 Va. 358, for their contention that low water mark means ordinary low water mark, but that case involved the construction of a Virginia statute relating to tide waters; also to *Kentucky Lumber Company* v. *King,* 65 S. W. 156, and other *Kentucky* cases; which it is contended follow the common-law rule, limiting rights of riparian owners to the water line, but seemingly departed from, to some extent at least, in *Miller* v. *Hepburn,* 8 Bush, 324.

Thus described, however, it is quite true that the line of low water mark could not be fixed for all time with absolute certainty, because at no two periods of the year could the line be delineated on the ground with absolute precision. The engineers, testifying with reference to Government Chart No. 76, say that they took as their bench mark the lowest water level ascertainable from all available sources. This was of course for the purpose of a monument for the work of improving the river with locks and dams as proposed by the federal government, and would not necessarily be binding upon riparian owners unalterably fixed and determined as to their rights. But in this case we not only have the evidence of experienced engineers that this is the usual and practicable way of determining the line of low water mark, but of numerous witnesses acquainted with the situation for many years, who locate the low water mark substantially where the government engineers located it; and for all practical purposes where could it be located with more reasonable certainty? If we can say ordinary low water mark is called for and should be fixed as the boundary, no witness has and no witness could fix it with more certainty than has been done by the engineers on Government Chart No. 76, referred to in the decree. And the evidence is pretty clear that the sand and gravel taken by the defendants was removed from within the level of low water mark, no matter what line may be designated, unless that line of low water mark has been shifted by the improvements of the Ohio River by the general government, whereby a nine-foot stage of water above low water mark, as located by the engineers, has been established and maintained. The defendants contend that the present low water mark thus established now controls plaintiff, and of necessity all other riparian owners. The evidence shows that this nine-foot level created by the dams on the river practically submerge all of the sand and gravel bar surrounding it and a part of Racoon Island and leaves little tillable ground above the pool stage of the water, and subjects that portion of the bar to public navigation and to their supposed right to take sand and gravel by government permit, from the sub-

merged part of the island without liability to the plaintiff for the value thereof. The record shows that plaintiff and defendants were competitive bidders for the island, but that the plaintiff having the prior option became the purchaser at about the price of $37,500.00; and not unlikely if the defendants had come out first in the race, the positions of the parties in this controversy would have been reversed. If the plaintiff or its predecessors had the rights decreed in the decree complained of, it is not conceived how they or it lost them to the defendants by the improvement of the river by locks and dams. Of course their rights necessarily had to yield to the rights of the public, but except in so far as the defendants have undertaken to use the water for navigation and commerce as a part of the public, they were not within their rights as navigators of the river. They took sand and gravel from the bar of the river for their private use, and were trespassers, we think, and subject to the plaintiff for damages. If not, as can be conceived, they might go on indefinitely to exhaust the necessary subjacent and lateral support of the island and finally destroy it altogether, or subject it to the action of the elements, which would result in the same thing. But for the river improvements, it appears defendants could not have occupied the territory with their boats and sand and gravel dredges requiring a good stage of water to float them and to carry on their business.

Defendants, in opposition to the views herein expressed, cite us to *Mendota Club* v. *Anderson*, 101 Wis. 479. The only question involved in that case was whether the defendants who were attempting to fish or hunt with boats such as the public used, over land submerged by waters due to the raising thereof by a dam, and which it was claimed by plaintiffs was within the territory covered by their deed, were trespassers thereon. The court decided that the defendants had the rights of the public to fish and hunt on the navigable waters of the state, and denied the injunction. If defendants, instead of fishing or hunting had driven their boats over the lands of the riparian owners and been engaged in dredging sand and gravel or taking the soil or any valuable product thereof to

the detriment of or against the rights of the plaintiffs, there would be some analogy between that case and this one. The facts not being the same, that case has little application, if any, to the one in hand.

In view of what we have said, we are of opinion to affirm the decree.

*Affirmed.*