# CHARLESTON.

## STATE *v.* FAUDRE.

Submitted January 6, 1903.—Decided November 14. 1903.

1. FERRIES.

   The State of Ohio has right to establish ferries on the Ohio side of the Ohio river and to fix their charges for ferriage over that river from Ohio to West Virginia. (p. 126).

2. FERRIES.

   West Virginia cannot punish one who acts under a ferry franchise given by the state of Ohio to operate a ferry from its side of the Ohio river over that river, for charging one coming from Ohio more than is allowed by West Virginia law for ferriage over that river. (p. 127).

Writ of error and *supersedeas* from the Circuit Court, Mason County.

Action by State of West Virginia against Bert Faudre. Judgment for plaintiff and defendant appeals.

*Reversed and Dismissed.*

ATTORNEY GENERAL for State of West Virginia.

H. R. HOWARD for defendant below.

BRANNON, JUDGE:

Bert Faudre was indicted in the circuit court of Mason County for charging C. E. Winger ten cents for ferriage of himself from Gallipolis, in the State of Ohio, over the Ohio river to the West Virginia side, contrary to the order of the county court, of Mason County fixing five cents as the charge. The case was tried by the court in lieu of a jury, and the court found Faudre guilty and fined him $10. As I understand the evidence the defendant was operating the ferry under a ferry franchise conferred by the Virginia Legislature in 1796, and re-enacted in 1819. He justified this charge under an ordinance of Gallipolis establishing a ferry "from the end of Court street" in that city, "across the Ohio River to the Virginia shore," and a license from the city to operate the ferry, the

ordinance allowing the ten cents charge, he operating under this license also.

The Ohio is a great navigable river dividing the states of Ohio and West Virginia, a public highway open to all. Unless an exception to the general rule, we must apply the general rule, which is, that "a state has the right to grant the exclusive right to ferry from its shores across a navigable river between two states." 16 Am. & Eng. Ency. Law 1091; Cooley, Con. Lim. 731. "In the case of boundary rivers, like the Mississippi, a ferry franchise conferred by a single state is valid without the concurrent sanction either of congress or of the state upon the opposite side of the river, or the right of landing beyond the limits of the state by which the grant is made." Gould on Waters section 35; *Conway* v. *Taylor,* 1 Black 603; *Gear* v. *Bull,* 34 Ill. 74. To say that a state has not this right to give its people facility of departure would detract from its sovereignty and be of great detriment. A ferry need not own land on both sides. *Conway* v. *Taylor,* 1 Black 603. The point of departure is the seat, the base, the home of the ferry. *Sistersville Ferry Co.* v. *Russell,* 52 W. Va. 356, (43 S. E. 107). "A ferry is in respect of the landing place, and not of the water. The water may be to one, the ferry to another." 13 Viner Abridg. 208 A; *Conway* v. *Taylor* cited. Thus, as the Ohio ferry had a foothold presumably on the end of Court street, Gallipolis, it was a lawful ferry. Under this rule no state can prohibit another from granting a ferry right. Under its franchise the boat can depart, and the stream being a highway, it can navigate its waters, and it can land on the opposite shore and cannot be prevented by the state on the opposite shore. It cannot land on private property without consent, but it has right to land at a public wharf, paying reasonable wharfage. In carrying persons and property it is engaged in interstate commerce and its landing could not be prohibited or taxed, though it may be made to pay wharfage. The landing is a necessary part of the act. *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196; *Cannon* v. *New Orleans,* 20 Wall. 577; *Newport* v. *Taylor,* 16 B. Monroe 784; *Trans. Co.* v. *City,* 107 U. S. 691. The right to have a ferry includes the right to land. The right to land is incidental to the right to navigate a public river. It is said that "the grant of a ferry franchise

across a river between two states gives only the right to ferry from the shore of the state granting the franchise." 12 Am. & Eng. Ency. L. 1092; *Well* v. *Chapman,* 2 Iowa 524; *Gear* v. *Bulleideck,* 34 Ill. 74.

But it is said that these principles apply only where the boundary of the opposite states is the middle of the river, giving each state indisputable jurisdiction over the shore and half the river, and that such is not the case with the Ohio river, for the reason that when Virginia granted to the Union the Northwest territory her grant conveyed the territory "situate, lying and being to the northwest of the river Ohio." Great difference of opinion has been expressed as to whether this reserved Virginia jurisdiction to low or high water mark on the west side of the Ohio. In *State* v. *Plants,* 25 W. Va. 119, it was held that "the jurisdiction of West Virginia is co-extensive with the water while confined within its banks." In *Ravenswood* v. *Fleming,* 22 W. Va. 52, it was held that "the bed, banks and shores of the Ohio river are held by the State in trust for the public." This would give West Virginia title to the top of the bank on the Ohio side. The first constitution of this state claims the state's jurisdiction to include "so much of the bed, banks and shores of the Ohio river as heretofore appertained to the state of Virginia;" whilst the second declared without reserve that the state "includes the bed, bank and shores of the Ohio river." But of course, we have no more than Virginia had. Nor could the constitution confer greater title than in law existed. In *Bridge Co.* v. *Pt. Pleasant,* 32 W. Va. 331, I expressed the opinion that our territory extended to the low water mark. I cited *Garner's case,* 3 Grat. 655, in support of this statement. In that case, fourteen Virginia judges sitting in the General Court were greatly divided and delivered exhaustive opinions, the decision by the majority holding in effect that low water mark was Virginia's western line. The actual decision imports that. So the Supreme Court of the United States has several times held. *Handley's Lessees* v. *Anthony,* 5 Wheat. 347, the great Chief Justice Marshall, a Virginian, delivering the opinion. In *Indiana* v. *Kentucky,* 136 U. S. 479, and *Henderson Bridge Co.* v. *Henderson City,* 173 U. S. 592, 612, it was again so held. These cases involved the

boundary line of Kentucky; but as Kentucky was formed from Virginia after the grant of the northwest territory, she has the same western boundary, and these decisions apply. Kentucky has uniformly held the low water mark. *McFall* v. *Commonwealth* 2 Metc. 394, 396. Indiana likewise. *Carlisle* v. *State*, 32 Ind. 55. Ohio holds that her territory extends at least to low water, if not to the middle. *Booth* v. *Shepherd*, 8 O. S. 243.

The chief argument for the line of the top of the bank on the Ohio side is the definition of a river. "A river is a running stream of water pent in on either side by banks, shores or walls." "A freshwater river, like a tidal river, is composed of the *alveus* or bed, and the water; but it has banks instead of shores. The banks are the elevations of land which confine the waters in their natural channel when they rise the highest and do not overflow the banks; and in that condition of the water, the banks and the soil which is permanently submerged, form the bed of the river." Gould on Waters, sections 41, 45. For the other side it may be said that to confine Ohio to the top of the bank would deprive her of necessary state powers, such as the erection of wharves and other facilities, as well as police control of her border, and refuse to her necessary state power, and detract from her sovereignty. As will be seen in *Handley* v. *Anthony*, cited, Chief Justice Marshall, was influenced by considerations of great inconvenience to the new states that were to be formed out of this cession by Virginia. Virginia, by act of January 2, 1781, made it a condition of her grant that new states should be formed out of the territory granted and it cannot be readily supposed that she intended to deprive such new states of the usual powers of states bounding on public rivers, and cramp their facilities by stopping their jurisdiction at the top of the river bank. It does seem to me that as the constitution of the Union gives to the national Supreme Court jurisdiction in controversies between states, and its decision must be final, the rulings of that court must be accepted as law. That court has exclusive jurisdiction touching boundary between states. *Virginia* v. *West Virginia*, 11 Wall. 39. I shall not pursue this question, as I known that I can shed no more light upon it additional to that reflected by the great arguments in the cases cited. If the low water line be the

line, there can be no question that Ohio has the right to establish ferries on her shore and to fix rates from the Ohio to the West Virginia shore. We do not say that greater charge could or could not be made from the West Virginia shore to the Ohio shore, as it is not involved. But we are not driven to say, as decision, whether *State* v. *Plants* is sound law. We can decide this case on another ground. After Virginia made the deed ceding to the Republic the northwest territory, congress passed the celebrated historic ordinance for the government of the territory "northwest of the river Ohio;" providing that "the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the said territory as to the citizens of the United States, and those of any other states that may be admitted into the confederacy, without any tax, duty or import thereon." Virginia, by act Dec. 20, 1788, referred to this ordinance and declared that "the afore-recited article of compact between the original states and the people and states in the territory of the Ohio river, be and the same are hereby ratified and confirmed, any thing to the contrary in the deed of cession of the teritory by this Commonwealth to the United States notwithstanding." If otherwise before, would not this act accord to Ohio full use of the Ohio river in such modes as rivers are commonly used, among them the power to establish and regulate ferries having their seats on the Ohio side? That is not all. In the Virginia act providing for the formation of Kentucky it is declared "that the use and navigation of the river Ohio, so far as the territory of the proposed state, or the territory which shall remain within the limits of this Commonwealth, lies thereon, shall be free and common to the citizens of the United States; and the respective jurisdiction of this Commonwealth and of the proposed states on the river as afore-said, shall be concurrent only with the states which may possess the opposite shores of the said river." How far does the concurrence of jurisdiction of West Virginia and Ohio go? What is meant by it? It is only necessary and proper in this case to say that it goes far enough to give Ohio power on her shore, whatever the line under the deed, to authorize a ferry and govern it by regulations. This concurrence of rightful jurisdiction

over the Ohio would seem to give ferries on the Ohio side right to carry both ways, and charge according to Ohio law. This compact of Virginia, on which Kentucky was admitted by congress into the Union, has been held to be national law by the Supreme Court. *Pennsylvania* v. *Wheeling Bridge Co.*, 13 How. 519; *Henderson Bridge Co.* v. *Henderson*, 173 U. S. 610. I find that in *Arnold* v. *Shields*, 5 Dana 22 and in *Newport* v. *Taylor*, 16 B. Monroe, p. 787, it is said of this compact: "Jurisdiction unqualified being, as it is, the sovereign authority to make, decide on and execute laws, a concurrence of jurisdiction must entitle Indiana to as much power—legislative, judicial and executive, as that of Kentucky over so much of the Ohio river as flows between them; and consequently neither of them can consistently with the compact, exercise any authority over their common river, so as to destroy, impair or obstruct the concurrent rights of the other."

The word jurisdiction, as here used, must be wide. Why should it be confined to any one of the three agencies of jurisdiction, legislative, executive or judicial? In *J. S. Keator L. Co.* v. *St. Croix Boom Co.*, 72 Wis. 62, 7 Am. St. R. 837, this "concurrent jurisdiction" under said congressional provision is discussed, and it is given broad construction, in holding that one state may under it allow a boom hindering navigation on the other side. It may be doubted whether that is such an exercise of power as is lawful, because permanently affecting the right of the othere state. "The state of Indiana possesses concurrent jurisdiction with the state of Kentucky for the enforcement of civil and criminal law on the Ohio river, where the two states possess the opposite shores." *Sherlock* v. *Alling*, 44 Ind. 184. The court said Indiana's legislation covered the river. It is only necessary for us to say now that Ohio had power to authorize a ferry and fix a charge for a person coming from its shore. The dividing line is one thing, concurrent jurisdiction is another thing. Kentucky, though having the same line as West Virginia, has always conceded to states on the Ohio opposite, right to establish and regulate ferries, and has held that her laws do not apply to them. *Newport* v. *Taylor*, 16 B. Monroe, 699; *Reeves* v. *Little*, 7 Bush. 469. See *Gear* v. *Bullerdick*, 34 Ill. 74. How can our law govern a ferry created by Ohio? After writing to this point, pursuing the matter of con-

current jurisdiction accorded states on the west of the Ohio, by Virginia, I find that congress in admitting Illinois provided that its western line should be the middle of the Mississippi river, and that "said state shall have concurrent jurisdiction * * on the Mississippi river with any state or states to be formed west thereof." In *Wiggins Ferry ·Co.* v. *Reddig,* 24 Ill. App. held that "neither Illinois nor Missouri can exercise exclusive jurisdiction over any part of the Mississippi, nor is either confined in the exercise of its own jurisdiction to the middle thereof. The two states exercise concurrent jurisdiction on the river for all judicial purposes." In matters to which this concurrence applies the state which first assumes—retains jurisdiction of a matter to the exclusion of the other. In *State v. Mullen,* 35 Iowa 199, the court interpreted this concurrence to give Iowa power to try a crime done on a boat near the Illinois shore. But the same court in *Buck* v. *Ellenbolt,* 15 L. R. A. 187, denied power in the state to abate a nuisance on an island east of the middle line, saying it was not on the river. But it said in all matters touching commerce on the river the state had concurrent jurisdiction over the whole river. As shown above a ferry boat is an instrument of 'commerce and inter-state commerce. Where two states bound on a river there is concurrence over the whole stream without compact. *Atchison* v. *Endless, &c.,* 40 Fed. 253; 16 Am. & Eng. Ency. L. (1 ed.) 258. By reason of this concurrent jurisdiction, regardless of the line, the decision that Plants was guilty in *State* v. *Plants,* cited, was right, as he sold liquor on a boat lying in the water of the Ohio.

It is immaterial that the charge was collected from Winger after leaving the Ohio side.

The fact that the Virginia franchise authorized ferriage both ways would not derogate from the right of Ohio to establish a ferry.

If it would change the result that the defendant was acting under the Virginia franchise before he got the Ohio license it does not appear which he accepted first.

After further examination of the question involved in this case, I find it settled by the decision of the supreme court of the United States, as also by the Kentucky supreme court in *Conway* v. *Taylor,* 1 Black. 603. A Kentucky ferry sought an injunction against an Ohio ferry to prevent its ferriage both

ways over the Ohio river, claiming exclusive right to do so under the Kentucky ferry grant. The lower state court awarded a total injunction, thus forbidding the Ohio ferry from ferrying either from Kentucky to Ohio or from Ohio to Kentucky. The Kentucky supreme court reversed this decree, and modified the decree of the lower court by limiting the injunction so as to prevent the Ohio ferry only from ferrying from Kentucky to Ohio. It thus recognized the full right of the Ohio ferry to ferry from Ohio to Kentucky. It conceded the right to ferry if "authorized transport from the Ohio shore from a ferry established on that side under the laws of that state," but held that the Kentucky grant gave exclusive right to ferry from the Kentucky shore. (See page 628). The supreme court of the U. S. affirmed this decision, conceding as beyond dispute the right of Ohio to establish a ferry upon its soil, saying that "the concurrent action of the two states is not necessary to the grant of a ferry franchise on a river that divides them. A ferry is in respect of the landing, not the water; the water may be to one, the ferry to another." Here the water is a public navigable way, and who disputes Ohio's right to the bank of the river? Owning to the bank she may attach a ferry to it. The federal supreme court further said, in speaking of the Kentucky law and decision, "the franchise is confined to the transit from the shore of the state. The same rights which she claims for herself she concedes to others. She has thrown no obstacle in the way of the transit from the states lying upon the other side of the Ohio and Mississippi. She has left that to be wholly regulated by *their* ferry laws. We have heard of no hostile legislation and of no complaints by any of those states. It was shown in argument at bar that similar laws exist in most, if not all, the states bordering upon those streams. They exist in other states of the Union bounded by navigable waters." In this extract, and in the whole opinion, the supreme court concedes and recognizes the right of Ohio to establish and regulate ferries on its bank of the Ohio. The Kentucky court, though it had statutes prohibiting apparently any ferriage from the Ohio shore except under a Kentucky franchise, refused to apply those acts to an Ohio ferry, and so did the National Supreme Court. How could it be otherwise considered alone under the compact made by Virginia upon the admission of Kentucky into the

Union? 1 Rev. Code 1819, p. 59. That compact makes the Ohio a public highway and gives *concurrent* jurisdiction over it to all states bordering on it, and deprived Virginia of *exclusive* jurisdiction over it. *Wheeling Bridge Case,* 13 Howard 518 Yet in this case Faudre was fined for charging a passanger going from Ohio to West Virginia, not from West Virginia to Ohio.

The decisions cited above were based on the compact between Virginia and Kentucky; but when we consider the later Virginia act, Code 1849, chapter 1, section 2, it is still plainer. Virginia thereby again ratifies that compact by asserting jurisdiction for herself "subject to the provisions contained in the articles of compact between ·Virginia and Kentucky hereinafter mentioned." See section 6. Our Code claims for this state jurisdiction over the Ohio "where there is no statute or compact to the contrary." Chapter 1, section 2. .This recognizes the concurrent jurisdiction conceded by that compact.

Under such concurrent jurisdiction granted by Virginia it would seem to me that Ohio could grant a ferry valid to carry from *both* sides of the Ohio; but that is only a suggestion of my own, and not involved in the case. It has been remarked that this doctrine would enable Ohio to ruin every West Virginia ferry. What of it? We cannot help it. It is the result of lawful competition in business under authority of law. It would redound to the public interest in cheapness of ferriage. *Tramp Co.* v. *Standard Oil Co.,* 50 W. Va. 611.

In *Crop* v. *Hopkins,* 6 W. Va. 323, the validity of a ferry grant by Ohio is recognized though the subject is not discussed.

"And in case of boundary rivers like the Mississippi a ferry granted by a single state is valid without the sanction of Congress or the state which bounds upon the opposite side of the river, or the right of landing beyond the limit of the state by which ·the grant is made" Gould Waters, section 35. I think the case of *Memphis* v. *Overton,* 3 Yerg. 387, sustains the foregoing view. See 16 B. Mon. 784, 787.

In *McFall* v. *Com.,* 2 Metc. 394, a man was fined for celebrating marriage on a boat on the Ohio; but the court conceded that if Ohio had passed a law to authorize the minister to marry, and had thus exercised concurrent jurisdiction with Kentucky, there could be no conviction. Under these principles

West Virginia ferry rates apply only to West Virginia ferry franchises, and Faudre was not subject to them.

Having taken up this case again I have just noticed that in *Garner's Case,* 3 Grat. 655, Judge Johnson said: "I conclude, therefore, that Virginia has exclusive jurisdiction to low water mark on this side of the river, and Ohio has exclusive jurisdiction on the other, while over the permanent river they both possesses concurrent jurisdiction; the ultimate property in the whole river to low water mark on the Ohio side remaining in Virginia." Here is properly conceded concurrent jurisdiction· The soil on which the river runs is West Virginia soil to low water mark on the Ohio side; but the water filowing over it is subject to concurrent jurisdiction of both states for certain purposes. It is that concurrent jurisdiction that rules this case. Above I have stated what it means. I add other authorities. Concurrent is "running together; having the same authority; thus we say such and such courts have concurrent jurisdiction, that is, each has the same jurisdiction." Bouv. Law Dic. "By conferring 'concurrent jurisdiction' congress intended to declare that transactions occurring anywhere on that river, between the two states, might lawfully be dealt with by the courts of either according to its laws. Where a court of one state assumed jurisdiction in a particular case it would be exclusive until relinquished." *Saunders* v. *N. O. & St. L. Anchor Line,,* 97 Mo. 26. See *State* v. *George,* 60 Minn. p. 505; *Opsall* v· *Judd,* 30 Minn. p. 129; *Memphis* v. *Pikey,* 142 Ind. 304; *Welsh* v. *State,* 126 Ind. 71, 9 L. A. A. C. 64; *Meyler* v. *Wedding,* 60· S. W. 20. Roer on Inter-State Law, 337, lays down correct law: "The existence of concurrent jurisdiction in two states over a river that is a boundary between them vests in each of such states, and its courts, except as to things permanent, and except as to maritime and commercial matters cognizable by the national government and its courts, jurisdiction both civil and criminal, from shore to shore of all matters of rightful state cognizance occurring upon such river in all parts thereof where it forms such common boundary." Observe, that it says that this concurrent jurisdiction applies to "all matters of rightful state cognizance occurring upon such river in all parts thereof."

Now, is not the establishment and regulation of a ferry

a matter of rightful state cognizance? Indeed, is it not a right of navigation? Can you deny that to a state on the Ohio river? Is it not a means of commerce on the water of the river? Can you deny the right of commerce? Observe, that there is a difference between the soil or the ground over which the Ohio runs, and its flowing water. The soil and things permanent in or attached to it as a bridge for instance are not subject to Ohio jurisdiction; but a boat used in ferriage is not such; a thing floating on the water. Many cases draw this distinction, holding that where there is a concurrent jurisdiction in two states upon a river, a state has no power over . soil or things fixed in it beyond its line; but as to things not such, but transitory, floating upon it, both have common concurrent powers. *Henderson* v. *Henderson,* 173 U. S. 592. The late well considered case of *Roberts* v. *Fullerton,* 93 S. W. 1111 in the Supreme Court of Wisconsin shows this distinction. There it is held that as to soil and things attached, the concurrent jurisdiction does not extend; but as to things having relation to the water, things transitory or floating upon it, it does fully extend. *Mississippi* &c. v· *Ward,* 2 Black 485, Judge Taliaferro, *Garner's case,* 3 Grat. 655, said it refers "only to things afloat." Surely both states may establish and regulate ferries over the Ohio.

For these reasons we set aside and reverse the finding and judgment of the circuit court, and find the defendant not guilty, and that he be discharged from the indictment and go thereof without day.

<em>Reversed and Dismissed.</em>

NOTE BY BRANNON, JUDGE:

I have not said that Ohio could establish a ferry on the West Virginia shore; but I think an Ohio ferry could carry back persons to Ohio.

POFFENBARGER, JUDGE, (*concurring*) ;

I do not wish to be understool as agreeing to all that is said in the opinion on the subject of concurrent jurisdiction and the character of the ferry franchise. The exercise of a ferry franchise is clearly not a mere incident to the right of nava-

gation. All citizens may use the navigable waters of this country without a license or permit of any kind from any of the States, and are only subject, in that respect, to such regulations as are imposed by the Acts of Congress. The right to operate a ferry is an entirely different matter. The right of navigation is exercised in the operation of a ferry, but it confers no right to operate it. That right must be acquired by legislative grant. *Conway* v. *Taylor,* 1 Black (U. S.) 603; 2 Wash. Real Prop. 6 Ed. section 1215; *Huzzey* v. *Field,* 2 C. M. & R. 431; *Mayor &c.* v. *Starin,* 106 N. Y. 1; *Nowton* v. *Cubitt,* 12 C. B. 31. A ferry right is separate and distinct from, and subordinate to, the right of navigation. Tied. Lim-Police Powers, 621; 21 Am. & Eng. Enc. Law, 2 Ed. 441; 12 Am. & Eng. Enc. Law, (2d Ed.) 1089.

Washburn on Real Property says: "Ferries, that is, rights of carrying passengers across streams, or bodies of water, or arms of the sea, from one point to another, for compensation paid by the way of a toll, are, by common law, deemed to be franchises, and could not, in England, be set up without the King's license, and in this country without the grant of the legislature as representing the sovereign power, and do not belong to the riparian proprietors of the soil."

*Conway* v. *Taylor,* cited, expressly holds that, "The authority to establish and regulate ferries is not included in the power of the Federal Government to "regulate commerce with foreign nations and among the several States and with the Indian Tribes."

I find no authority which, in my opinion, gives a shadow of countenance to the proposition that a State bordering upon a navigable river, and having concurrent jurisdiction with another State bordering upon the opposite side of such river, may establish a ferry from its own shore across the river and also from the shores of such other State across the river. None of the cases referred to in the opinion stand upon such a state of facts. No such claim was made or upheld in any of them. The nature of a ferry franchise and the obligations imposed upon the State in the granting of it and upon the licensee in accepting it, stand opposed to such an idea. A

ferry franchise is a valuable right. It is property created by law, by the sovereign power of the State. *Patrick* v. *Ruffners,* 2 Rob. 222; *Huzzey* v. *Field,* 2 C. M. & R. 431, 440; *Reg.* v. *Railway Co.,* L. R. 6 Q. B. 422; *Mayor &c.* v. *Starin,* 106 N. Y. 1; *Conway* v. *Taylor,* 1 Black, (U. S.) 603.

As said in the opinion of JUDGE BRANNON, a ferry "is in respect to the landing place, and not of the water." Ohio certainly has no right to the West Virginia shores. All that can possibly be conceded to her is jurisdiction of the shore on her own side of the Ohio river.

As against all except the sovereign granting a ferry franchise, it is exclusive, and shuts out all other persons from the exercise of the right conferred. Concurrent jurisdiction for the establishment of ferries from both sides of the river by each State at the same place, is contradictory. Neither State could protect and uphold the right granted by it by controlling the rates and the result might be a service wholly inadequate to, and unsuitable for, the accommodation of the public. Such a construction would give conflict of jurisdiction rather than concurrence. A safe rule for arriving at a conclusion is the conduct of the States and the construction adopted by them. So far as I am able to find, no State has ever attempted to do such a thing. West Virginia and Kentucky content themselves with granting franchises from their own shores to the opposite shore, and Ohio, Indiana and Illinois with granting franchises from their shores to the opposite shores only. The only real and substantial concurrence in respect to the granting of ferry franchises is to be attained by limiting the power of each State to the granting of such franchises from its own shore to the opposite shore. That gives each State power over the river in that respect. Concurrence is thereby effectuated. The nature of this exercise of the sovereign power is such that if it be carried further there is direct and useless conflict between the two States, which it cannot be supposed was ever intended.

Another view which supports this proposition is that the granting of a franchise does not carry with it a right of landing. 12 Am. & Eng. Enc. Law, 2 Ed. 1097; *Burrows* v. *Gallup,* 32 Conn. 499; *Walker* v. *Armstrong,* 2 Kan. 198; *Prasser* v. *Wapelle,* 18 Ia. 327; *Grant* v. *Drew,* 1 Ore. 35. Some decis-

ions are to the contrary, but they are against the weight of authority. 12 Am. & Eng. Enc. Law, 2 Ed. 1097.

In *Conway* v. *Taylor*, an effort was made by persons under an invalid grant of a ferry franchise from the city of Newport, and a license granted by the State of Ohio to obtain the right to ferry from the Kentucky side, to the detriment of another person holding a valid Kentucky franchise. It does not appear from the report of the case whether the Ohio license purported to give such right to ferry from the Kentucky shore, but the decree of the Kentucky court, which the Supreme Court of the United States affirmed, inhibited the parties claiming under the invalid Kentucky franchise and the Ohio franchise from ferrying from the Kentucky shore.

My concurrence goes only to the extent of conceding the validity of the ferry franchise from the Ohio side to the West Virginia side granted by the City of Gallipolis, and the right to the holder of that franchise to charge the rate of ferriage fixed by the Ohio authorities, and his innocence of any violation of the West Virginia ferry law in so doing.

DENT, JUDGE, (*concurring*) :

While I concur in the conclusion, there are some things in the opinion of JUDGE BRANNON that I do not assent to without reservation. This case depends on the ownership of the north-western bank or shore of the Ohio River. If it belongs to West Virginia, Ohio has no control over the same, and no right to establish ferries therefrom. The Constitution of this State, section 1, Art. II, claims it to be a part of this State. and it has been so held in the case of *Ravenswood* v. *Fleming,* 22 W. Va., 52. The constitution also provides in section 1, Art. 1, that "The Constitution of the United States, and the laws and treaties made in pursuance thereof, shall be the supreme law of the land." This necessarily includes the decisions of the Supreme Court of the United States. That court has held that exclusive jurisdiction to determine the boundary between states rests with it. *Virginia* v. *West Virginia,* 11 Wall., 39. It has already determined the boundary between this state and the North Western territory ceded to the United States by the State of Virginia, including the State

of Ohio, to be low water mark on the Ohio side. *Handley's lessees* v. *Anthony,* 5 Wheat., 374; *Indiana* v. *Kentucky,* 136 U. S., 497; *Bridge Co.* v. *Henderson City,* 173 U. S. 592.

This should settle this question and put it forever at rest unless the Supreme Court of the United States should be led to change its position, which is not at all likely for the very reason that it is the only truly equitable conclusion under the circumstances that the court could justly reach in the interest of the general public good. This gives this state the land to low water mark on the Ohio side, and Ohio the land between high and low water mark on the same side, which necessarily includes the shore. The shores and bed of the river are thus held respectively by the two states in trust for the public good, and they cannot become the subject of private ownership. Ohio then has control of its shore, with the exclusive sovercign right to establish ferries therefrom to the opposite shore, while West Virginia has the same exclusive right to establish ferries from its shore. To make a complete ferry from shore to shore, both going and coming, requires the consent of both states. The navigable waters that run between the shores is under the concurrent jurisdiction of both states for the purposes of navigation, although from low water mark on the Ohio side to the West Virginia shore they are within the State of West Virginia. *Conway* v. *Taylor,* (U. S.), 1 Black, 603; Section 15, Chapter 44, Code.

In the light of the decisions of the Supreme Court of the United States, the Constitution of this State, and the holding of this Court in the case of *Ravenswood* v.*Fleming,* 22 W. Va., 52, are wrong in so far as the Ohio shore and banks of the Ohio river are concerned for when Virginia ceded to the United States all the territory north-west of the Ohio river, the word "river" meant the line of the waters of the river at low water mark. This is a question which in my opinion has been and should remain settled. *Ganer's case,* 3 Grat. 655; Code Va., 1860, chapter 1, section 2. The great states of Ohio and West Virginia by mutual compact should fix their line by permanent monuments so as not to permit it to be subject to the changes of the bed and shores of the river caused by natural and artificial fluctuations. Wisdom would dictate such course.