THE STATE OF NEW JERSEY, at the relation of the department of health of the State of New Jersey,

*v.*

THE CHEMICAL COMPANY OF AMERICA, INC.

[Submitted April 10th, 1919. Decided May 9th, 1919.]

1. Where a company manufacturing chemicals at a point on a river, five miles above the intake of water supplied to a city for drinking purposes, discharges factory refuse into the river, and deposits such refuse on the river bank, such company will be enjoined from so doing at the

suit of the department of health of the state. Actual pollution of the water by the refuse need not be shown, as the statute imperatively prohibits the deposit of such refuse in portable streams or upon the banks thereof.

2. Banks and rivers defined.

On bill, &c.

*Mr. Thomas F. McCran,* attorney-general, *Mr. William Newcorn* and *Mr. Grover C. Richman,* assistant attorney-general, for the state.

*Mr. John K. English,* for the defendant.

BACKES, V. C.

The defendant is charged with discharging factory refuse into the Rahway river, and with depositing such refuse on the river bank above the point from where the city of Rahway takes its water supply, in violation of the statute of March 17th, 1899 (*Comp. Stat. p. 5811*), as amended by chapter 229 of the laws of 1918. *P. L. 1918 p. 836.* That act provides that—

"No excremental matter, domestic, factory, workshop, mill, or slaughter-house refuse, creamery or cheese factory waste, garbage, dye stuffs, coal tar, sawdust, tank bark or refuse from gashouses or other polluting matter"

shall be discharged into any river, stream, &c., or placed or suffered to remain upon the banks thereof, above the point from which any municipality obtains its supply of water for domestic use, and provides the remedy of injunction.

The defendant manufactures chemical products at its plant located at the confluence of two streams, called for convenience north and south branches, which empty into the Rahway river five miles and more above the Rahway intake. When the company began operating in 1915 all the liquid waste of the factory was emptied directly into the south branch, and this continued for two years until the department of health interposed upon the complaint of Rahway. The defendant then took measures to clarify the refuse by eliminating the more objectionable prop-

erties, the solids, and to store and retain the effluent upon its own premises. Elevated settling basins were installed, and a lagoon was constructed, and later a second and connecting lagoon, into which the effluent from the settling basins is discharged. These remedial steps were taken after consulting the health authorities of the state, and, as I understand, with their approval. The progress made and methods pursued were, it seems, unsatisfactory to these officials, and before the work was completed the attorney-general filed this bill. At the hearing last May pollution of the streams was established, but as it was not appreciable at Rahway, and the defendant was furnishing to the federal government an exclusive product for the prosecution of the world war, the inconveniences of the parties, in the trying circumstances, were considered, and an injunction was withheld, contrary to the peace-time rule laid down in *Hennessy* v. *Carmony, 50 N. J. Eq. 616.* The bill was retained with leave to bring the matter on for further hearing if the dyke and other devices then under construction failed of their object. After the armistice the state brought the cause to a further hearing in February last, complaining that the pollution continued, notwithstanding the efforts of the defendant to abate it. At that time the dyke of the outer or second lagoon had been finished; a moat, of a depth lower than the lagoons and skirting the dyke, was dug and connected to sumps (catch basins) to intercept seepage, and the sumps were fitted with automatic pumps to pump the seepage back into the lagoon. More than that, before the second hearing came to an end, the bed of the south branch was filled up and the stream diverted, so that its nearest point to the lagoon is one hundred and fifty feet and more instead of fifty feet away, and scientific experiments to neutralize the effluent were under way.

Despite this earnest endeavor the lagoons are not watertight, and some of the waste content still leaks into the streams polluting them, not to any great extent, it is true, and may be not noticeable, or even chemically discoverable, at Rahway, as the defendant contends. A part of the easterly wall of the first lagoon is made up of a pervious railroad embankment through

which the liquid seeps into a narrow and shallow run called Flemmer's ditch that empties into the north branch. Personal observation, bottle samples and analyses of the brook water satisfy me of this. It is also evident that the lagoons are fissured, and that the diversion of the channel of the south branch furnished but a temporary remedy. Before the south branch was filled up and diverted the liquid waste entered the stream subterraneously at a point known as the "spring hole" in considerable volume, and in the natural course it is only a matter of time when the effluent will find an outlet in the new bed.

That the refuse, the wash of chemical compounds, is deleterious to health and objectionable because of odor, taste and discoloration is proved by the facts that all fish life in the immediate vicinity of the factory was destroyed during the first years of operation, when the flow of the waste into the streams was unrestrained, and that at that time it could be smelled and tasted in the drinking water of Rahway. Its color is orange to dark brown.

It is not a good plea that the pollution is not now perceptible at Rahway because of mitigation in quantity and quality of the effluent; nor that the more obnoxious of the polluting matter is nitrobenzol which to taste and smell is likened unto oil of bitter almonds, and sometimes used as its substitute by bakers and confectioners in their wares, or that it is benzaldehyde; nor that to take a poisonous dose one would have to drink more of the polluted water than would be required to drown in; and it is a feeble and irrelevant argument that the inhabitants of Rahway would suffer no inconvenience if their filtration plant were of an up-to-date type and properly managed. These extenuating circumstances advanced by the defendant would be, perhaps, admissible if the cause were for the suppression of a common law nuisance, but as this suit is in aid of the police power of the state they are wholly beside the issue. The aim and policy of the legislature, as evinced by the statute, is to secure to populated communities wholesome drinking water, and, in vindicating the sovereign right of the state to the purity of its streams, it last year adopted measures more emphatic than before by placing its ban upon specific contaminations and things in gen-

eral that are polluting. As the act originally read it prohibited the discharge into, or depositing upon the banks of, streams furnishing potable water to municipalities, of

"sewage, drainage, domestic or factory refuse, excremental or other polluting matter of any kind whatsoever which, either by itself or in connection with other matter, will corrupt or impair, or tend to corrupt or impair, the quality of the water of any river, brook, &c.,  *  *  *  or which will render, or tend to render, such water injurious to health."

This involved in the trial of every offence, not only the fact that the proscribed foreign substances were being discharged into the streams, but also the determination by the courts that they corrupted or impaired or tended to corrupt or impair the quality of the water, or rendered or tended to render it injurious to health. *State Board of Health* v. *Diamond Mills Paper Co., 63 N. J. Eq. 111; affirmed, 64 N. J. Eq. 793.* In the amendment of 1918 the legislature itself determined that factory refuse and the other mentioned wastes and castoffs are contaminating, and peremptorily forbade their discharge into streams and their deposit upon the banks thereof.

The defendant is violating the law in both of these aspects. As has been pointed out, there is drainage of the refuse into the streams, at least into one of them, and it is of no moment that it has not been or cannot be traced to spigots in Rahway. The pollution aimed at by the statute is at the point of discharge into the stream. *State Board of Health* v. *Diamond Paper Mills Co., supra; State* v. *Wheeler, 44 N. J. Law 88.* The vast body of liquid waste stored on the banks—the lagoons cover an area of approximately five acres and the average depth of the liquid content is two and one-half feet—is a standing menace. Overflows after heavy downpours of rain, break in the dyke from wash or lateral pressure, wastage through the fissures in the lagoons, and its ultimate escape into the new bed of the south branch, are ever-threatening dangers. And these do not comprise all the reasons for apprehension. There is constant seepage at various places in the dyke, as I personally observed, that flows, generously, through the moat into the sumps, and in prolonged and heavy rains the contrivances for catching the

waste and pumping it back into the lagoons are of little utility, as was recently experienced, as I understand, when the moat overflowed carrying the refuse into the brooks. In the circumstances, the confidence expressed by the defendant that it can successfully retain the refuse in the lagoons, and its assurance that it will, to the immunity of the water, cannot be considered. The statute condemns not only actual pollution but pronounces as imperatively against the threat and menace of it upon the banks of streams.

The defendant makes no point of it that the effluent stored on the land *near the banks* was not "placed or suffered to remain *upon the banks*" of the streams, within the meaning of the statute. The attorney-general moots the proposition in his brief. I entertain no doubt that the legislature did not use "banks" in the literal sense and according to the strict definition of the lexicon, and I assume that defendants' counsel considered the question not open to argument.

"The bank is the outermost part of the bed in which the river naturally flows. In the words of the Digest, 'that is considered to be bank which contains the river when *fullest.*'

"The bank may be thus rightly defined as that line or ridge of earth which contains the river holding the natural direction of its course." *Houck R. 3, 5.*

"The banks of the stream are the elevations of land which confine the waters to their natural channel when they rise to the highest point at which they are still confined to a definite course and channel." *Farnham W. R. 1462.*

"The banks of a river are those elevations of land which confine the waters when they rise out of the bed; and the bed is that soil so usually covered by water as to be distinguishable from the banks, by the character of the soil, or vegetation, or both, produced by the common presence and action of flowing water. But neither the line of ordinary high-water mark, nor of ordinary low-water mark, nor of a middle stage of water, can be assumed as the line dividing the bed from the banks." *Howard et al. v. Ingersoll, 13 How. 381, 427; Sun Dial Ranch v. May Land Co., 61 Ore. 205.*

"A river is a running stream of water pent in on either side by banks, shores or walls; a fresh water river, like a tidal river, is composed of the *alveus,* or bed, and the water; but it has banks instead of shores. The banks are the elevations of land which confine the waters in their natural channel when they rise the highest and do not overflow the banks; and in that condition of the water the banks, and the soil which is permanently submerged, form the bed of the river." *Gould W.* §§ *41, 45; State* v. *Faudre, 54 W. Va. 122, 125.*

The legislative scheme to purify the streams of the state contemplates the exclusion of two avenues of corruption—that of direct discharge of polluting matter into the water, which necessarily includes depositing on the bank from which it is bound to fall or flow into the stream, and that of depositing it so near the banks as to constitute a threat or menace of ultimately reaching the water, contaminating it. Now, to give to the word "banks," as used in the statute, a construction other than its popular signification—the immediate drainage region of lands contiguous to streams—would render the design of the second feature of the act wholly abortive. It would be playing with words and trifling with legislative mandate to hold that discharges of polluting matter on the bank anywhere below the brink would be violative of the statute, while a deposit on the bank an inch away from the brink would not be. When Chancellor Walker had *State* v. *Town of Phillipsburg, 83 N. J. Eq. 422,* under consideration, he seems to have had no doubt that garbage dumps on lands immediately adjacent to the bank of the Delaware river, the refuse of which, in normal times, by reason of the natural slope of the ground, found its ways into the waters of the river, and in case of freshets was washed directly into the waters of the river, violated the provisions of the act. The decision turned upon another ground, but it is significant that in that hotly-contested case, the point was passed *sub silentio.*

At the second hearing there was testimony of human excremental deposits at a number of places on the banks of the two streams. This offence was not alleged and from aught that ap-

pears there were no grounds for it when the bill was filed. The deposits were accidentally discovered by the state's witnesses in their search for evidence of waste pollution, and upon notice to the defendant the offending feces were removed. At the beginning of the argument I told counsel to dismiss this ground of complaint from further consideration because the occurrences were incident and isolated. It appeared that the defendant had provided ample sanitary accommodations for its employes and that the infractions were due to their predilection or perversion of which the defendant was not cognizant.

I will advise a decree enjoining the defendant from discharging its factory refuse into the north and south branches of the Rahway river (by whatever names they may be known) and from placing or suffering its factory waste to remain on the banks of these streams. The injunction upon the discharge of waste into the streams will go into effect at once and the injunction against storage will be effective on October 1st, 1919. The defendant has assiduously and in good faith sought to abate the pollution, and, as it has prospects of neutralizing the waste, it ought to be given reasonable opportunity to develop the treatment. The injunction may stipulate that the escape of waste by seepage will not, in the meanwhile, be considered a violation of the injunction, provided reasonable care is taken to prevent overflow and to keep the dyke, moat, sumps and pumps in repair and working condition, and provided the defendant forthwith takes measures to prevent seepage through the railroad embankment into Flemmer's ditch by extending the moat northerly to the end of the old or first lagoon.

The complainant is entitled to costs.