Jones, J.
In support of its demurrer the ferry company contends that the rate of twelve tickets for thirty cents for the workhand and shopping tickets is unlawful for the reason that the city had no authority to prescribe such a rate to one class of people and deny it to citizens of the city generally.
' Were we to construe this ordinance as requiring that such tickets should be sold only to a single class, the contention of the ferry company might be sustained, but, as we view it, the sale of twelve tick *251 ets for thirty cents, designated as “workhand and shopping tickets” is extended to any citizen of the city who may desire to avail himself of that rate, and the tickets so sold are in substance those usually known as commutation tickets, which may be sold indiscriminately to any who may desire to purchase them. This construction of the ordinance was employed for more than twenty years by the ferry company, as the petition states that during such time the ferry company sold the so-called “workhand and shopping tickets” without discrimination at the rate of twelve for thirty cents, to any and all persons who applied for the same. Therefore, in view of our construction of the ordinance, which construction was also employed by the ferry company continuously during that time, we find no discrimination by classification either in law or fact.
However, a more serious question arises in this case, that is, can an Ohio municipality, located on the west bank of the Ohio river, fix a rate of return ferriage from the east bank of the Ohio river to the west bank upon which the municipality is located? Can the city of Bellaire, in Ohio, fix a rate of return ferriage from the city of Benwood, in West Virginia? Undoubtedly this is the effect of this ordinance, for by the sale of twelve tickets for thirty cents, going or returning, concededly the passenger may use one of those tickets for the return passage to the Ohio shore. Whatever authority the city of Bellaire may have arises from the statutory authority granted it by the following section of the General Code:
“Sec. 3fi42. The exclusive power to establish, regulate, and license ferries, from such corporation, or any landing therein, to the opposite shore, or *252 from one part of the corporation to another, and in granting such license, to impose such reasonable terms and restrictions, in relation to the keeping of such ferries, and the time, manner, and rates of the carriage and transportation of persons and property, as may be proper,” etc.
Counsel for the ferry company contend that the foregoing section only authorizes the ferriage rates to be fixed from the “municipal corporation, or landing therein, to the opposite shore,” and that it has no authority under that section to fix a return rate from the opposite shore to the Ohio municipal corporation on the west bank. It is therefore contended that such section should be so construed, and thus construed is within the municipal powers; and that if otherwise construed the city of Bellaire has no legal authority to pass an ordinance fixing a rate of return ferriage from the West Virginia shore to the Ohio shore. There is no doubt in our minds that not only by the language of the ordinance but in its operative effect the ferry company was required to charge and accept a return fare to Ohio from the West Virginia shore. Twelve tickets could be bought for thirty cents, and these could be utilized for the return trip, and if bought in that number the passenger paid a fare of two and one-half cents not only from Ohio to West Virginia, but also from West Virginia to Ohio. As to these tickets, therefore, the effect of the ordinance was to establish a return rate from West Virginia. The petition does not state whether the state of West Virginia, or its municipality of Benwood, had taken any concurrent action in regard to ferriage rate3 from Benwood to Bellaire, although it was intimated by counsel in argument that such was in fact the *253 ease. However, we do not deem that important in settling the question involved. This depends upon the basic principle involving the right of the state to make a regulation which may affect the jurisdiction of a sister state.
In Port Richmond & Bergen Point Ferry Co. v. Board of Chosen Freeholders of Hudson County, 234 U. S., 317, while Mr. Justice Hughes construed the ordinance in that case as not requiring the company to issue round-trip tickets, he queried the question involved in this case by the following statement (page 333): “Whether it would be competent for the State, through the local board, to require the company to issue round-trip tickets, is a question not presented by the record, and we express no opinion upon it.”
This same feature was before the court, but not necessary for its decision, in the case of State v. Faudre, 54 W. Va., 122. The following is found in the syllabus: “The State of Ohio has the right to establish ferries on the Ohio side of the Ohio river and to fix their charges for ferriage over that river from Ohio to West Virginia.” Judge Brannon suggested in his opinion that the Ohio ferry might carry back persons to Ohio, but that was merely a suggestion of his own. However, the concurring judges in a separate opinion, evidently deeming that question important, vigorously denied the suggestion made by their associate. On page 133, Poffenbarger, J., said: “I find no authority which, in my opinion, gives a shadow of countenance to the proposition that a State bordering upon a navigable river, and having concurrent jurisdiction with another State bordering upon the opposite side of such river, may establish a ferry from its own shore *254 across the river and also from the shores of such other State across the river. * * *. So far as I am able to find, no State has ever attempted to do such,a thing. West Virginia and Kentucky content themselves with granting franchises from their own shores to the opposite shore, and Ohio, Indiana and Illinois with granting franchises from their shores to the opposite shores only.” In that view Dent, J., concurred in the following language at page 136: ‘ ‘ Ohio then has control of its shore, with the exclusive sovereign right to establish ferries therefrom to the opposite shore, while West Virginia has the same exclusive right to establish ferries from its shore. To make a complete ferry from shore to shore, both going and coming, requires the consent of both states.” And in this connection, in the Pt. Richmond Ferry Co. case, supra, Mr. Justice Hughes remarked, page 331: “Where the ferry is conducted over a boundary stream, each jurisdiction with respect to the ferriage from its shore has exercised this protective power.”
The jurisdiction of Ohio, exercised • directly, or through its municipality by delegation, is confined to her own borders. Every court which has reviewed this question has defined a ferry to be the establishment or landing, or point of departure from its own shore. And it is by reason of that fact only that the state exercises its power of license or control, including that of fixing the rate of ferriage from the point within its own jurisdiction. The state of West Virginia, or the municipality of Ben-wood, may not have taken concurrent action, although it has been intimated by counsel that such has been done. However, that is not significant because any invasion by a sister state upon the *255 rights of another cannot he tolerated. In the case of Conway v. Taylor’s Executor, 1 Black (66 U. S.), 603, counsel for the Ohio Ferry Company made the point that the Kentucky ferry franchise was a nullity when confined to that shore only, and that it required the concurrent jurisdiction of both states to give it validity; hut Mr. Justice Swayne, delivering the opinion of that court, said “The concurrent action of the two States was not necessary. ‘A ferry is in respect of the landing place, and not of the water. The water may he to one, and the ferry to another.’ ” It is that basic principle, which confines the state in its control and regulation of ferries to “respect of the landing place” within the state limits, that gives it the right of various forms of police regulation, and so long as congress has not acted in the national interests, or in its control of interstate commerce, each state has ■the powers of local regulation reserved to it by the federal constitution.
Such statutes as we have in Ohio pertaining to the regulation of ferries have been substantially adopted by the sister states bordering on the Ohio river, and the following cases hold in effect that while the sister state may regulate the ferriage from its own borders across a navigable stream it has no authority to authorize the grantee to transport from the opposite shore. In Weld v. Chapman, 2 Iowa, 524, the court announced in its syllabus:
“The state of Iowa could not grant a ferry right, which would operate, or confer any rights, on the territory of the state of Wisconsin.
“Still less does such a grant, authorize the grantee to transport passengers from the Wisconsin to the Iowa side of the Mississippi river.
*256 ‘ ‘ So, a similar grant by Wisconsin, gives no authority on the Iowa shore, and confers no right to transport from the Iowa side.” Twenty-two years later the supreme court of Iowa, in the case of Burlington & Henderson County Ferry Co. v. Davis, 48 Iowa, 133, adhered to that rule. And in Gear v. Bullerdick, 34 Ill., 74, Mr. Justice Breese delivering the opinion of the court took the same view. In the case of Covington & Cincinnati Bridge Co. v. Kentucky, 154 U. S., 204, there was involved the right of fixing rates of toll and fare over the bridge spanning the Ohio river at Covington. Mr. Justice Brown, on page 220, in delivering the opinion, said: “It is clear that the State of Kentucky, by the statute in question, attempts to reach out and secure for itself a right to prescribe a rate of toll applicable not only to persons crossing from Kentucky to Ohio, but from Ohio to Kentucky, a right which practically nullifies the corresponding right of Ohio to fix tolls from her own state.” And in the course of his opinion, at page 221, he illustrated the effect of such possible conflict of jurisdiction by the following statement: “For instance, suppose the agent of the Bridge Company in Cincinnati should refuse to recognize tickets sold upon the Kentucky side, enabling the person holding the ticket to pass from Ohio to Kentucky, it would be a mere brutum fulmen to attempt to punish such agent under the laws of Kentucky. Or, suppose the state of Ohio should authorize such agent to refuse a passage to persons coming from Kentucky who had not paid the toll required by the Ohio statute; or that Kentucky should enact that all persons crossing from Kentucky to Ohio should be entitled to a free passage, *257 and thus attempt to throw the whole burden upon persons crossing in the opposite direction.”
It would seem, therefore, that concurrent action by the state of West Virginia is not material because its jurisdiction and power to regulate fares from its shores is paramount and exclusive. The city of Bellaire received its entire power in the regulation of ferries from the state of Ohio, and it had no authority to exceed the powers thus expressly granted.
Coming now to the construction of the Ohio statute delegating this power to the municipality, and construing it in consonance with the paramount and exclusive power of West Virginia touching the fixing of ferriage rates, we hold that Section 3642, General Code, merely authorizes the municipality to fix rates of transportation from any Icmding in such municipality to the opposite shore only. The requirement, therefore, that the ferry company should be entitled to charge for ferrying each way a fare of thirty cents for twelve workmen and shopping tickets was an unauthorized exercise of municipal power, and the operative effect of such an ordinance was to regulate, in part, the return ferriage from the West Virginia shore.
For the reasons stated, the judgments of the lower courts are affirmed.

Judgments affirmed.

Marshall, C. J., Johnson, Hough, Wanamaker, Robinson and Matthias, JJ., concur.