Argued October 6, reversed and remanded November 20,
petition for rehearing denied December 16, 1975

# BELMONT ET UX, *Appellants, v.* UMPQUA SAND & GRAVEL, INC., *Respondent.*

542 P2d 884

*William C. Wolke* of Luoma, Kelley & Wolke, Roseburg, argued the cause for appellants. Also on the brief was Mark A. Rossi, Roseburg.

*Gordon G. Carlson,* Roseburg, argued the cause and filed a brief for respondent.

O'CONNELL, C. J.

This is an action to recover the value of river gravel alleged to have been removed from plaintiffs' property. Plaintiffs appeal from a judgment entered on a verdict in favor of defendant.

Plaintiffs and defendant own adjoining parcels of property along the South Umpqua River in Douglas County. Defendant is engaged in the sand and gravel business. Plaintiffs contend that defendant removed gravel from their portion of the river bed.[1] Defendant contends that part of the gravel alleged to have been taken from plaintiffs' property was taken from defendant's portion of the bed of the stream and that gravel taken from plaintiffs' portion of the river bed was in exchange for topsoil which defendant delivered to plaintiffs.

■ Whether defendant removed gravel from plain-

---

[1] The South Umpqua River is non-navigable as it flows past plaintiffs' and defendant's property and therefore each owns to the thread of the stream.

tiffs' property turns, in part, upon the proper location of the boundary line between the property of the parties in the bed of the South Umpqua River. The description of plaintiffs' property is set out in the margin.[2] It will be noted that the description designates the "bank of the South Umpqua River" as a monument. The description designates 4781.1 feet as the distance from the beginning point to the bank of the river. If the "bank of the river" is taken to mean the water's edge, the distance between the beginning point and the bank of the river is more than 4781.1 feet and there would then be an inconsistency between the call for the monument and the call for distance, in which case the monument would control.[3] The following diagram will facilitate an explanation of the

[2] Beginning at a point which is a rock at the corner in the angle in the North and West boundary line of the Wm. McKinney Donation Land Claim #50, in Tn. 27 S., R. 6 W., W.M., then North 4781.1 feet to the South bank of the South Umpqua River; then along the South bank of the South Umpqua River South 30° 40' E. 512.2 feet; thence South 27° 10' East 26.7 feet to a 1½" x 24" I.P. from which an Elderberry tree 9" in diameter bears North 24° 45' W. 117 feet; thence South 3957.2 feet to a 1¼" x 12" I.P.; then West 33.4 feet to a 1¼" x 15" I.P.; thence South 343.1 feet to the center line of County Road from which a 1½" x 14" Iron Bar bears North 29.8 feet; thence S. 85° 58' West 240.8 feet to the place of beginning containing 28.24 acres, more or less, in Douglas County, Oregon. * * * (The far southerly portion is excepted).

[3] ORS 93.310. "The following are the rules for construing the descriptive part of a conveyance of real property, when the construction is doubtful, and there are no other sufficient circumstances to determine it:

"(1) Where there are certain definite and ascertained particulars in the description, the addition of others, which are indefinite, unknown or false, does not frustrate the conveyance, but it is to be construed by such particulars, if they constitute a sufficient description to ascertain its application.

"(2) When permanent and visible or ascertained boundaries or monuments are inconsistent with the measurement, either of lines, angles or surfaces, the boundaries or monuments are paramount.

"(3) Between different measurements which are inconsistent with each other, that of angles is paramount to that of surfaces, and that of lines paramount to both.

contention of the parties. The call "thence North 4781.1 feet to the South bank of the South Umpqua River" reaches only to point A on the diagram (distance O A), which is more than 40 feet from the river at its closest point (distance A C) and more than 70 feet from the river if the call is extended to the river along the same line (distance A B).

Defendant asserts that the boundary line should run from O to A and then from A to E perpendicular to the thread of the stream. Plaintiffs take three alternative positions. It is urged that the line O A should be extended to a straight line to the thread of the stream (D). If this is rejected, plaintiffs contend that the line O A should be extended to the high-water mark (B) and thence by a line perpendicular to the thread (at F), or O A should be extended to the low-water mark (G) and thence perpendicularly to the thread (at H).

The trial judge reached the conclusion, and so instructed the jury, that the 4781.1 call was consistent with the call "to the South bank of the South Umpqua River" and established the line at O A E. He arrived at this conclusion by defining "bank" so as to include the rising ground bordering a river, even though the ground in no way relates to the flow of the river.

---

"(4) When a road or stream of water not navigable is the boundary, the rights of the grantor to the middle of the road, or the thread of the stream, are included in the conveyance, except where the road or bed of the stream is held under another title.

"(5) When tidewater is the boundary, the rights of the grantor to low water mark are included in the conveyance, and also the right of this state between high and low water-mark.

"(6) When the description refers to a map, and that reference is inconsistent with other particulars, it controls them, if it appears that the parties acted with reference to the map; otherwise the map is subordinate to other definite and ascertained particulars."

■ This conception of "bank" as it relates to the application of boundary rules is erroneous. The bank of a river is a topographical feature having relation to the water which it confines. The bank refers to the land adjacent to the water.[4] The definition of "bank" in terms of the relation of water and the land which it touches is recognized in *Sun Dial Ranch v.*

[4] Clark on Surveying and Boundaries (3d ed 1959), p. 725; Graham v. Knight, 240 SW 981, 983 (Tex Civ App 1922).

588

*May Land Co.,* 61 Or 205, 216, 119 P 758 (1912), where the court said: "The bank may be rightly defined as that line or ridge of earth which contains the river, holding the natural direction of its course."⑤ And, in *Richards v. Page Investment Co.,* 112 Or 507, 520, 228 P 937 (1924), involving a description with a call to the bank of a navigable stream, the court said: "* * * Ordinarily the term 'bank' is synonymous with that high-water mark, below which the title was originally in the state, and not in the general government."⑥ Where the grantor owns to the middle of a non-navigable stream and there is a call to the bank of the stream, the rights of the grantor to the thread of the stream are included in the conveyance.⑦

■■ In such a case, although the description is in terms of the bank as the boundary, the title to the bed of the river passes by implication along with the bounded upland. Where the river's course is straight or nearly so and the side lines of the riparian tract

⑤ The same idea is embodied in the definition of "bank" found in Skelton, Boundaries and Adjacent Properties (1930), § 283, p. 309.

⑥ In Oklahoma v. Texas, 260 US 606, 631, 43 S Ct 221, 67 L Ed 428, 433 (1923), the Court treated the boundary line as being the average or mean level of high water, the Court saying: [T]he bank intended by the treaty provision is the water-washed and relative permanent elevation or acclivity at the outer line of the river bed which separates the bed from the adjacent upland, whether valley or hill, and serves to confine the waters within the bed and to preserve the course of the river, and that the boundary intended is on and along the bank at the average or mean level attained by the waters in periods when they reach and wash the bank without overflowing it." The opinion does not disclose whether the river involved was navigable or non-navigable although it would appear from the small volume of water flowing in the river it was probably non-navigable.

⑦ ORS 93.310 (4). "When a road or stream of water not navigable is the boundary, the rights of the grantor to the middle of the road, or the thread of the stream, are included in the conveyance, except where the road or bed of the stream is held under another title."

meet the course of the stream more or less perpendicularly the side lines are generally extended to the median line of the stream constituting a direct continuation of the upland lines.[8] However, where the upland division lines meet the stream at an acute angle, the division line in the bed is to be determined not by extending the upland division lines but by some other method which will fairly apportion the bed between the riparian owners.[9]

■ It appears from the evidence in this case that some method other than the straight line extension of the upland lines should be adopted in establishing the parties' boundary line in the bed of the river.[10] A line should be extended perpendicularly from the thread of the stream toward the upland. The question, then, is: At what point should the perpendicular line running from the thread intersect the terminus of the upland line? There are several possible points of intersection: (1) the water's edge;[11] (2) the high-

[8] See Columbia Land Co. v. Van Dusen Invest. Co., 50 Or 59, 91 P 469, 11 LRA(NS) 287 (1907); and Annotation, 65 ALR2d 143, 159 § 6(a) (1959).

[9] Montgomery v. Shaver, 40 Or 244, 247, 66 P 923 (1901); Columbia Land Co. v. Van Dusen Invest. Co., *supra* note 8; Tauscher v. Andruss, 240 Or 304, 307, 401 P2d 40 (1965); 65 ALR2d 143 (1959); and see Manual of Instructions for the Survey of the Public Lands of the United States 1973, §§ 7-57 to 7-59, pp. 168-169.

[10] An examination of the diagram, *supra*, reveals that a straight line extension of the side boundary (line O D) gives plaintiffs ownership of the river bed in front of defendant's river frontage. This is an undesirable result. *See* Manual of Instructions for the Survey of the Public Lands of the United States 1973, § 7-57, p. 168 (which discusses appropriate methods of apportionment).

[11] "Water's edge" has been interpreted to mean the low-water mark. State ex rel Citizens Electric Lighting & Power Co. v. Longfellow, 169 Mo 109, 69 SW 374, 379 (1902). It has also been treated as synonymous with "shore," interpreted as "mean high tide." United States v. Stewart, 121 F2d 705 (9th Cir 1941), reversed on other grounds, Stewart v. United States, 316 US 354 (1942).

water mark; (3) the average or mean level; (4) the low-water mark.

 We are of the opinion that the intersecting point should be the high-water mark.[19] The high-water mark is more readily ascertainable, thus facilitating precision of measurement regardless of the water level at any particular time. Location of the terminus of the boundary lines at the high-water mark is also consistent with efficient use of riparian property. The boundaries should be consistent with the usual practice of building improvements into the stream from the high-water mark (or farther upland) perpendicular to the course of the stream.[20]

As we have noted, a line should be extended perpendicularly from the thread of the stream to the point at which the upland line touches the high-water mark (yielding a boundary shown as O B F on the diagram). There is some disagreement in the cases

---

[19] "High-water mark" is defined as "the point to which the water usually rises, in an ordinary season of high water * * *." Johnson v. Knott, 13 Or 308 at 310, 10 P 418 (1886). More specifically, it has been defined as "the point on the bank or shore up to which the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic. [Citation omitted.] And where the bank or shore at any particular place is of such a character that it is impossible or difficult to ascertain where the point of ordinary high-water mark is, recourse may be had to other places on the bank or shore * * * to determine whether a given stage of water is above or below ordinary high-water mark." Diana Shooting Club v. Husting, 156 Wis 261, 145 NW 816, 820 (1914), quoted with approval in State v. McFarren, 62 Wis2d 492, 215 NW2d 459, 463 (1974).

[20] See Bade, *Title, Points and Lines in Lakes and Streams,* 24 Minn L Rev 305, 333 (1940). Using the high-water mark as the point of intersection would also be consistent with the cases involving navigable streams where wharf rights and other rights to the use of the bed of the stream are apportioned by running a line from the thread to the point at which the upland line intersects the high-water mark. Montgomery v. Shaver, 40 Or 244, 66 P 932 (1901).

as to the method of establishing the thread of the stream. Some courts have held that the thread is the middle of the river measured when the water is at its lowest stage.⑭ Other courts have defined the thread as a line drawn equidistant from the ordinary high-water marks of the opposite banks of the stream.⑮

■ In our opinion, the latter method of dividing the water bed is preferable in most cases. The use of the high-water mark on the opposite shore provides more readily ascertainable and more precise terminus points for measurement; in most cases it more fairly apportions the river bed between the upland owners on the opposite banks; and we think that it comports with the common understanding of what constitutes the middle of a stream and the point marking the underwater boundary of the upland owners on the stream.

■ This latter method may, however, present a problem where, because of the peculiar slope of the bed of the stream, the owner on one side of the stream would lose access to the stream at low-water. In these circumstances it would be proper to determine the thread as the line measured from the opposite shores at low rather than high-water.⑯

⑭ *See* Gibson v. Cobb, 236 Cal App2d 226, 46 Cal Rptr 57 (1965); Bishel v. Faria, 53 Cal2d 254, 347 P2d 289, 1 Cal Rptr 153 (1959).

⑮ *See,* e.g., Holmes v. Haines, 231 Iowa 634, 1 NW2d 746, 749 (1942).

⑯ This was the solution adopted in Micelli v. Andrus, 61 Or 78, 120 P 737 (1912). The court was careful to point out that the low-water mark was used because of the peculiar topographical character of the bed in that case. This suggests that the court would have recognized a different rule would be applicable if a thread equidistant from the ordinary high-water marks would not be a part of the exposed bed even at the lowest stage of water. It is interesting to note that several of the cases cited in footnote 14, *supra,* defining the thread as the middle of the stream measured at the lowest stage of water erroneously re-

 Plaintiffs also assign as error the failure of the court to instruct the jury on the law relating to the willful confusion of goods. Since the case is remanded for a new trial, we deem it advisable to consider this contention. If there is evidence of a willful confusion of plaintiffs' gravel with the gravel of defendant, the jury should be instructed that a willful confuser has the burden of proving what proportion of the goods is his. To meet this burden, the wrongdoer need not prove the exact amount contributed by each; the burden is met by showing the approximate amount contributed by each. However, all doubts are resolved against the wrongdoer in making the division based upon an approximation. If the facts as to the amount contributed by each are so vague that not even a reasonable approximation of the minimum amount contributed by the wrongdoer can be made, he forfeits his interest in the confused mass.

 Plaintiffs contend that the trial court erred in failing to instruct the jury that a willful act includes the situation where one intends to do an act with indifference to the possible results. The courts have had difficulty in defining the term "willful" in the confusion cases. It is generally agreed that a "willful" state of mind may include something other than malice, or an evil motive, or a disposition to harm the plaintiff. Thus it has been held to include an act done in a reckless disregard of the rights of others.[⑩] If, in the present case, evidence is adduced from

gard *Micelli v. Andrus, supra,* as adopting that definition as the general rule in Oregon.

Another possible solution to the problem which prompted the decision in the *Micelli* case would be to establish the thread midway between the high-water marks but recognize an easement in the owner who loses access to the stream at low water.

[⑩] Ayre v. Hixson, 53 Or 19, 98 P 515, 133 Am St Rep 819, Ann Cas 1913E, 659 (1908).

which the jury could reasonably find that defendant knew that the boundary was uncertain and that it might be trespassing upon plaintiffs' portion of the river bed, but in spite of this defendant removed the gravel, plaintiffs would be entitled to an instruction that such conduct would be willful.

■ Defendant has urged us to dismiss this appeal on the ground that plaintiffs' assignments of error do not set out in the brief the requested instruction not given, nor the instructions given which plaintiffs contend are erroneous. None of the exceptions taken by plaintiffs are set out in the brief. Thus plaintiffs have failed to follow the requirements of Rule 6.18 of the Rules of Procedure of this court. We could, therefore, disregard these assignments of error which, in this case, would result in a dismissal of plaintiffs' appeal. However, because we think that the questions presented in this appeal should be decided by us, we have elected to waive the rule in this instance. As a means of impressing upon the members of the bar the importance of complying with the Rules of Procedure essential to the efficient operation of a heavily burdened court, we deny costs on appeal for the printing of plaintiffs' brief.⑧

Reversed and remanded for a new trial.

---

⑧ Similar action was taken in Wynn v. Sundquist, 259 Or 125, 485 P2d 1085 (1971).